Tom BEANAL, on behalf of himself and
all others similarly situated

v.

FREEPORT-McMoRAN, INC., and
Freeport–McMoRan Copper
and Gold, Inc.

Civil Action No. 96–1474.

United States District Court,
E.D. Louisiana.

April 10, 1997.

Martin E. Regan, Jr., Regan, Manasseh & Boshea, Oscar Augusto Araujo, Araujo & Associates, LLP, New Orleans, LA, for plaintiffs.

John Charles Reynolds, John Jerome Weigel, R. Patrick Vance, M. Richard Schroeder, Andrew Russell Lee, Mary L. Hassinger, Alida C. Hainkel, Jones, Walker, Waechter, Poitevant, Carrere & Denegre, John S. Keller, New Orleans, LA, for defendants.

DUVAL, District Judge.

Before the court is a motion to dismiss Plaintiff Tom Beanal's ("Beanal") claims against Freeport–McMoRan, Inc. and Freeport–McMoRan Copper & Gold, Inc. (collectively "Freeport"), which motion was heard with oral argument on October 23, 1996. Having reviewed the pleadings, the memoranda, and the applicable law, the court finds as follows for the reasons set forth below: (1) Plaintiff has standing to bring claims on his own behalf for cultural genocide of the Amungme tribe, certain human rights violations, and environmental claims, but lacks standing to bring claims on behalf of others for summary execution and disappearances; (2) Plaintiff has failed to state a claim for genocide in violation of the law of nations, pursuant to the Alien Tort Statute; (3) Plaintiff has failed to allege state action as required under the Alien Tort Statute because he failed to allege that Freeport acted under color of Indonesian law; (4) The Torture

Victim Protection Act does not supersede or impliedly repeal the causes of action under the Alien Tort Statute for torture and extra-judicial killing committed in violation of the law of nations; (5) The Torture Victim Protection Act does not apply to corporations; and (6) Plaintiff has failed to state a claim for an environmental tort in violation of the law of nations.

### The Parties

Plaintiff Tom Beanal ("Beanal") is a resident of Tamika, Irian Jaya within the Republic of Indonesia. He is a leader of the Amungme Tribal Counsel of Lambaga Adat Suku Amungme (LEMASA). He filed suit against Freeport on April 29, 1996, individually and on behalf of all other similarly situated. Plaintiff filed his first amended complaint on May 16, 1996. Since no class has been certified, Beanal is the lone plaintiff at this stage.

Defendants Freeport–McMoRan, Inc. and Freeport–McMoRan Copper & Gold, Inc. are Delaware corporations headquartered in New Orleans, Louisiana. Freeport owns an Indonesia-based subsidiary named P.T. Freeport Indonesia ("PT–FI").

Freeport operates the "Grasberg Mine," an open pit copper, gold and silver mine situated in the Jayawijaya Mountain in Irian Jaya, Indonesia. The mine allegedly encompasses approximately 26,400 square kilometers.

### The Complaint

Beanal's first amended complaint alleges that Freeport has committed environmental torts, human rights abuses, and cultural genocide. Beanal states that the court has jurisdiction over this case based on diversity jurisdiction, pursuant to 28 U.S.C. § 1332 (" § 1332"), the Alien Tort Statute, 28 U.S.C. § 1350 (" § 1350"), and the Torture Victim Protection Act of 1991, sec. 1, *et seq.*, 28 U.S.C. § 1350 note. Freeport's motion to dismiss focuses solely on the latter basis for jurisdiction under § 1350, and does not mention Plaintiff's diversity based claims. Ac-

cordingly, the court does not address those claims for damages and specific relief, if any, based on diversity jurisdiction. Since the prerequisites for diversity jurisdiction appear to have been satisfied and are not contested, this court has subject matter jurisdiction so long as Plaintiff can state at least one claim for relief. The court could exercise supplemental jurisdiction over other claims against Freeport. 28 U.S.C. § 1367.

The court reviews the claims made pursuant to § 1350 to determine if a cause of action exists.[1] The current view of § 1350 is that it grants a federal cause of action as well as a federal forum in which to assert the claim. *Xuncax v. Gramajo*, 886 F.Supp. 162, 179 (D.Mass.1995) (citations omitted). The Fifth Circuit has acknowledged the generally held view that section 1350 is appropriately used by individuals asserting claims for violation of the international law of human rights. *De Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1396, n. 16 (5th Cir.1985). Freeport appropriately moved to dismiss for failure to state a cause of action, under Rule 12(b)(6) of the Federal Rules of Procedure, rather than for lack of subject matter jurisdiction, under Rule 12(b)(1). Fed. R. Civ. Proc. 12(b)(1) and (6).

### Summary of Freeport's Bases for Dismissal

Freeport asserts numerous reasons for the court to dismiss the claims for human rights violations and the environmental claims. First, Freeport argues that Beanal lacks standing to bring human rights claims in his own behalf or on behalf of others. As to the human rights claims asserted pursuant to the Alien Tort Statute, Freeport argues: (1) The Alien Tort Statute does not provide a private right of action; (2) Freeport is not a state actor; and (3) The TVPA supersedes the Alien Tort Statute for claims of torture and extrajudicial killings. As to the human rights violations asserted under the Torture Victim Protection Act ("TVPA"), Freeport argues that Beanal has failed to state a claim

---

**1.** To satisfy the jurisdictional threshold under § 1350, a plaintiff must state a tort in violation of the law of nations. Courts have, accordingly, engaged in a more searching preliminary review of the merits than is required, for example, under the more flexible "arising under" formulation. *Filartiga v. Pena–Irala*, 630 F.2d 876, 887 (2nd Cir.1980).

because: (1) The TVPA does not apply to corporations; (2) Beanal has not alleged that Freeport acted under color of foreign law; (3) Beanal failed to exhaust local remedies.

Freeport asserts five bases for dismissal of claims for international environmental torts brought under § 1350: (1) Beanal lacks standing to bring the environmental claims; (2) Beanal has failed to state a claim because environmental practices do not violate the law of nations; (3) The act of state doctrine bars Beanal's claims; (4) The local action doctrine mandates dismissal; and (5) The claims should be dismissed for failure to join an indispensable party, namely, the Republic of Indonesia.

The court discusses each issue in turn.

### Standard for Motion to Dismiss

Freeport filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. The court confirmed by Minute Entry that it would not consider any matters outside the pleadings in deciding this motion. Minute Entry of Oct. 17, 1996, Record, Doc. No. 95. Further, the plaintiff cannot amend his complaint by briefs submitted in opposition to the motion to dismiss. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984) *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985); *Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir.1995). Beanal's opposition memorandum presented summaries of the allegations which varied slightly from those contained in his amended complaint which the court disregards.

In deciding a Rule 12(b)(6) motion, the court must accept all material allegations of the complaint as true and construe them in favor of the non-moving party. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). The court may only grant dismissal if it appears beyond doubt that the plaintiff can prove no facts in support of his claim which would entitle him to relief. *Id., citing Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). The court is not required to "conjure up unpled allegations" to save a complaint. *Systems Contractors Corporation v. Orleans Parish School Board, et al.*, 1996 WL 547414, *1,

(E.D.La. Sept. 24, 1996), *citing Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir. 1988).

■ The court may treat a Rule 12(b)(6) dismissal motion as a motion for a more definite statement, even if the motion is not so styled. See Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1378, at 634 (1991); *Forti v. Suarez–Mason*, 672 F.Supp. 1531, 1541 (D.C.Cal.1987), reconsidered on other grounds, 694 F.Supp. 707 (N.D.Cal.1988). This would be appropriate, for example, in order for Plaintiff to state specific facts on which he bases his individual allegations of human rights violations. *Forti*, 672 F.Supp. at 1541. This way, the court can remain true to the notice pleading permitted under the federal rules and at the same time accurately assess the facts pled.

### A. STANDING

Beanal stands as the lone plaintiff in this case since no class has been certified. Uniform Louisiana Local Rule 1.12B provides that a plaintiff must move for class certification within 90 days after filing a complaint, unless the period is extended for good cause by motion. Plaintiff Beanal filed this action on April 29, 1996 and moved for an extension of time within which to seek class certification on August 1, 1996, approximately four days after the ninety-day period had lapsed. Plaintiff's motion for more time was denied on August 6, 1996 and he did not seek reconsideration of said denial. Record, Doc. No. 56.

Beanal has standing to assert claims on his own behalf. Beanal does not purport to be an organizational representative. Beanal identifies himself as "a leader of the Amungme Tribal Council Lembaga Musyawarah Adat Suku Amungme ('LEMASA')," but does not appear to be suing on behalf of "LEMASA" since he sued "individually and on behalf of all other similarly situated class members (Indigenous People of Irian Jaya)." Unlike Beanal, LEMASA is not listed as a party and the complaint does not indicate that LEMASA is bringing suit.

Furthermore, Beanal has not alleged facts which would entitle him to bring claims on behalf of a third party. Typically, there are three instances in which third party standing is permissible: (1) where individuals can represent the interests of parties who are unlikely to be able to represent their own interests; (2) where there is a close relationship between the advocate and the third party; and (3) where a statute is challenged as being unconstitutionally overbroad. Erwin Chemerinsky, *Federal Jurisdiction* § 2.3.4 (2d.1994) (hereinafter *"Federal Jurisdiction"*). Beanal has not alleged facts that would entitle him to claim any of these exceptions to the general rule against third party standing.

By definition, claims for disappearance and summary execution are based on harm to a third party. *Xuncax v. Gramajo*, 886 F.Supp. 162, 189 (D.Mass.1995). Section 1350 is silent concerning a plaintiff's standing to bring suit based on an injury to another. *Id.* It is generally assumed that where Congress is silent as to such a detail, federal courts borrow from state law, unless its application would defeat the purpose of the federal statute. *Id.* at 190. In *Xuncax* the court determined who could bring a claim under § 1350 for summary execution and disappearances by following the approach used by other courts in determining the statute of limitations applicable under § 1350. *Id.* "To determine whether to apply federal or state limitations period, the Court must first identify the closest analogies under both federal and state law...." *Id.* The *Xuncax* court found that the statute most analogous to § 1350 was the Torture Victim Protection Act, which provides that the victim's "legal representative" or "any person who may be a claimant in an action for wrongful death," may recover based on an extrajudicial killing. The House Report on the TVPA states that "[c]ourts look to state law for guidance as to which parties would be proper wrongful death claimants." H.R.Rep. No. 256, 102nd Cong., 1st Sess. 87 (1991). This court is also persuaded that the Torture Victim Protection Act is most analogous to § 1350. Accordingly, the court turns to Louisiana law to determine who can bring suit under the Alien Tort Statute.

Louisiana law does not permit the bringing of a wrongful death action by a non-relative of the victim. Louisiana Civil Code Article 2315.2 lists the following surviving relatives of the deceased who may bring a wrongful death action: spouse, children, father, mother, brothers, sisters. La. C.C. Art. 2325.2. The court finds that Beanal, who has not identified himself as a relative of any victim, would be unable to bring a wrongful death action in Louisiana, and therefore lacks the standing to sue on behalf of victims of disappearance or summary execution under § 1350.

To meet the standing requirements under Article III, the Fifth Circuit requires that plaintiff demonstrate two things:

First, that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and [2] second, a causal connection between the injury and the conduct such that the injury is "likely to be redressed by a favorable decision. The Supreme Court has recognized that injuries to a plaintiff's aesthetic, conservational and recreational interests are sufficient to meet the first requirement of Article III standing."

*International Primate Protection League v. Administrators of the Tulane Educational Fund*, 895 F.2d 1056, 1058 (5th Cir.1990) (citations omitted), *reversed on other grounds*, 500 U.S. 72, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991). For purposes of determining standing on a motion to dismiss, the court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990). The *Lujan* Court acknowledged that the burden of meeting the standing requirement on a motion to dismiss is considerably less onerous than on a motion for summary judgment. *Id.*

In light of Beanal's status as the sole named plaintiff, the court finds that he has standing to bring claims on his own behalf for certain human rights violations, genocide

and environmental torts. Beanal alleges in his complaint that he has been personally injured by certain human rights abuses and environmental practices. The court finds that Beanal has standing to assert those claims for which he alleges an individualized injury. Beanal requests a judgment for money damages as well as specific relief, either of which would redress the harm caused by Freeport for its alleged wrongdoing, if any.

Disregarding those allegations which appear to have been made on behalf of other putative class members,[2] the following specific injuries shall be regarded as having been asserted by Plaintiff individually:

(1) Torture, detention, surveillance, destruction of property. Amended Complaint ¶ 12. Plaintiff may have experienced such practices personally and claims damages for associated injuries. *Id.* ¶ 46.

(2) Purposeful, deliberate, contrived and planned cultural demise of the Amungme culture due to various human rights and environmental violations. *Id.* ¶¶ 41–45. The court permits Beanal to make his claim for "cultural genocide" as a member of the Amungme tribe only.

(3) All alleged environmental violations from various mining practices carried out in and nearby the locality where Plaintiff resides, including: destruction, pollution, alteration, and contamination of natural waterways, as well as surface and ground water sources; deforestation; destruction and alteration of physical surroundings. *Id.* ¶¶ 24–40. Plaintiff alleges that he is a resident of Tamika, Irian Jaya, Indonesia, where the Grasberg mine is located, and is a member of an indigenous tribe that inhabits the area. As a local inhabitant, Plaintiff has a palpable interest in the damage Freeport allegedly causes to nearby waterways and water source, soil, and forests, as well as any aesthetic injuries.

## B. HUMAN RIGHTS VIOLATIONS

Beanal seeks to redress human rights violations under the Alien Tort Statute and the Torture Victim Protection Act. As noted above, Beanal complains individually of (1) arbitrary arrest and detention, (2) torture, (3) surveillance, (4) destruction of property, and (5) severe physical pain and suffering. *Id.* ¶ 12. Beanal alleges that Freeport engaged in these abuses through its security guards "in conjunction with third parties."

Based on a liberal construction of his complaint, Plaintiff may have been injured in connection with the following incidents described in the complaint:

(1) Repeated acts of torture have occurred at Freeport security stations and Freeport containers, which conduct includes kicking with military boots, beating with fists, sticks, rifle butts, stones; starvation, standing with heavy weights on the subject's heads, shackling of thumbs, wrists and legs, *Id.* ¶ 16;

(2) Security surveillance of Plaintiff and others resulting in fear and mental stress, *Id.* ¶ 17;

(3) Torture victims were forced to stand in Freeport containers in water calf-high which reeked of human feces, *Id.* ¶ 18;

(4) Indigenous people have been detained with their eyes taped shut, thumbs tied, subject to repeated beatings by Freeport security personnel and third parties acting in conjunction with said personnel, *Id.* ¶ 19.

The court must determine whether Beanal has stated a cause of action under the Alien Tort Statute or the Torture Victim Protection Act for any of these alleged injuries.

### 1. § 1350: The Alien Tort Statute

The Alien Tort Statute provides:

The district courts shall have original jurisdiction of any civil action by an alien for a

---

**2.** The following claims are made on behalf of others and disregarded for purposes of this motion: (1) Wendy Tambuni was stabbed and shot to death while being transported on Freeport bus, Amended Complaint ¶ 13; (2) Three unnamed civilians were killed after being tortured, *Id.* ¶ 14; (3) Four unnamed civilians were arbitrarily arrested at their homes, imprisoned in Freeport containers and then disappeared, *Id.* ¶ 15.

tort only, committed in violation of the law of nations.

28 U.S.C. § 1350. Beanal has not pled nor argued that a treaty applies. Rather, Beanal asserts that Freeport's conduct violated the law of nations.

Though mostly ignored since its enactment in 1789, § 1350 has more recently been used in connection with international human rights litigation. *Filartiga v. Pena–Irala,* 630 F.2d 876, 887 (2d. Cir.1980). Courts have recognized important precepts which relate to this case, namely, where a private individual asserts a claim against a private actor for violation of the law of nations. First, § 1350 provides a private right of action. *Id.* at 887; *In re Estate of Ferdinand Marcos, Human Rights Litigation,* 25 F.3d 1467 (9th Cir.1994), *cert. denied,* 513 U.S. 1126, 115 S.Ct. 934, 130 L.Ed.2d 879 (1995); *Kadic v. Karadzic,* 70 F.3d 232, 238 (2d Cir.1995); *Abebe–Jira v. Negewo,* 72 F.3d 844, 847 (11th Cir.1996); *Xuncax,* 886 F.Supp. at 179; *Forti,* 672 F.Supp. at 1539 (N.D.Cal.1987). Second, an individual found to have violated the law of nations may be held liable under § 1350. *Filartiga,* 630 F.2d at 880; *Kadic,* 70 F.3d at 239; *Xuncax,* 886 F.Supp. at 179; *Forti,* 672 F.Supp. at 1540.

To make out a claim under § 1350, three elements must be satisfied: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations. *Kadic,* 70 F.3d at 238, *citing Amerada Hess Shipping Corp. v. Argentine Republic,* 830 F.2d 421, 425 (2nd Cir.1987), *reversed on other grounds,* 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). The first two requirements are satisfied here: Beanal is an alien and has alleged tortious conduct.

The issue before the court, therefore, is to determine whether the alleged conduct sets forth a violation of the law of nations. To do so, the court must determine, first, whether there is an applicable norm of international law and, second, whether it has been violated. *Xuncax,* 886 F.Supp. at 184. To be recognized as an international tort under § 1350, the alleged violation must be definable, obligatory (rather than hortatory),

and universally condemned. *Filartiga,* 630 F.2d at 881. In making its determination, a court is guided by the sources from which customary international law is derived, including the usage of nations, judicial opinions and the works of jurists. *Id.,* citing *Filartiga,* 630 F.2d at 884; *cf. Carmichael v. United Technologies Corp.,* 835 F.2d 109, 113 (5th Cir.1988). *Filartiga* instructed that the law of nations is dynamic, rather than static: "[C]ourts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today." *Filartiga,* 630 F.2d at 881. In sum, an international tort, i.e. one that violates the law of nations, should satisfy the following requirements:

> (1) no state condones the act in question and there is a recognizable "universal" consensus of prohibition against it; (2) there are sufficient criteria to determine whether a given action amounts to the prohibited act and thus violates the norm; (3) the prohibition against it is nonderogable and therefore binding at all times upon all actors.

*Xuncax,* 886 F.Supp. at 184, *citing Forti,* 672 F.Supp. at 1539–1540; Restatement (Third) of Foreign Relations Law of the United States §§ 701–702 ("Restatement").

Freeport first contends that state action is required to violate international law. Freeport argues that Beanal has failed to allege state action and therefore cannot state a claim for violation of the law of nations. *Carmichael,* 835 F.2d at 113 (claim for official torture pursuant to § 1350 dismissed for failure to allege that defendant corporation conspired, aided or abetted a foreign state actor). Freeport further maintains that Beanal has failed to allege facts to state a claim for genocide even if the court should find that state action is not a required element of that claim.

The court must determine whether state action is required to state a claim in violation of the law of nations. On this point, the Second Circuit's decision in *Kadic v. Karadzic,* 70 F.3d 232 (2d Cir.1995), is instructive. In *Kadic,* two groups of victims, Croat and Muslim citizens of Bosnia Herzegovina, filed suit against Radovan Karadzic, the self-pro-

claimed President of Bosnian–Serb Republic within Bosnia Herzegovina. The plaintiffs complained that they were the victims of various human rights violations, including rape, forced prostitution, forced impregnation, torture, summary execution, genocide, other cruel, inhuman, and degrading treatment, assault and battery, sex and ethnic inequality, and wrongful death. The victims sought relief under the Alien Tort Statute, The Torture Victim Protection Act, and federal question jurisdiction. *Kadic,* 70 F.3d at 237. The district court dismissed the suit for lack of subject matter jurisdiction. The Second Circuit reversed and remanded the case to the district court for further findings as to genocide, war crimes, state action, torture and extrajudicial killing.[3] *Id.* at 250.

■ In *Kadic,* the Second Circuit held that state action is not required for all international torts. Id. at 239. Certain conduct violates the law of nations whether committed by a state or private actor, whereas other conduct only violates the law of nations if committed by a state actor. This court, as guided by the analysis in *Kadic,* reaches the same conclusion. Genocide, for example, violates international law, whether undertaken by a state or nonstate actor. *Id.* The Restatement provides that a state has jurisdiction "to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern," such as piracy, hijacking, genocide, war crimes, and certain acts of terrorism. Restatement § 404. So-called "universal jurisdiction" exists over the specified offenses, as a matter of customary law, "as a result of universal condemnation of those activities and general interest in cooperation to suppress them, as reflected in widely accepted international agreements and resolutions of international organizations." *Id.,* comment a. Where a state has universal jurisdiction, it may punish conduct although the state has no links of territoriality or nationality with the offender or victim. *Id.* Universal jurisdiction includes civil tort actions. *Id.,* comment b. Though the list of offenses specified in section 404 is not static,[4] genocide is the only relevant offense for which universal jurisdiction exists and no state action must be proven.

■ A broader range of conduct is actionable as violative of the law of nations only when committed by a state actor. Restatement section 702 provides:

A state violates international law if, as a matter of state policy, it practices, encourages, or condones

(a) genocide;

(b) slavery or slave trade;

(c) the murder or causing the disappearance of individuals;

(d) torture or other cruel, inhuman, or degrading treatment or punishment;

(e) prolonged arbitrary detention;

(f) systematic racial discrimination; or

(g) a consistent pattern of gross violation of internationally recognized human rights.

As discussed below, some of the acts listed under section 702, e.g., murder and torture, could be actionable without proof of state action if committed as acts of genocide. Standing alone, however, the acts of murder and torture are only actionable by proof of state action.[5]

---

3. The court also found that service of process was proper; that the court had personal jurisdiction over the defendant; that the case was justiciable under the *Baker v. Carr* political question analysis, 369 U.S. 186, 211, 82 S.Ct. 691, 706–07, 7 L.Ed.2d 663 (1962); and that the act of state doctrine seemed inapplicable.

4. The previous Restatement (Second) included only piracy and the reporter's notes of the Restatement (Third) reference additional offenses, such as apartheid and hostage taking. *Id.,* note 1. "International law is not static, but an evolving body of directives which courts must inter-

pret in a contemporaneous fashion." *Xuncax,* 886 F.Supp. at 180.

5. In *Kadic,* the court stated:
 [A]t this threshold stage in the proceedings it cannot be known whether appellants will be able to prove the specific intent that is an element of genocide ... It suffices to hold at this stage that the alleged atrocities are actionable under the Alien Tort Act, without regard to state action, to the extent that they were committed in pursuit of genocide or war crimes, and otherwise may be pursued against Karadzic to the extent that he is shown to be a state actor.

### 2. § 1350 Claim Not Requiring State Action: Genocide

Beanal's complaint of genocide is less than crystal clear. One portion of the first amended complaint is entitled "Cultural Genocide," but the word "genocide" does not otherwise appear. Beanal essentially complains that the alleged human rights abuses and environmental violations have resulted in the demise of the culture of the indigenous tribal people.

The court reviews the facts Beanal alleges under the caption "Cultural Genocide":

¶ 41. The Plaintiffs specifically reallege each and every paragraph of the foregoing complaint.

¶ 42. The Plaintiffs allege that the human rights violation and the eco-terrorism engaged in by the defendant corporations have destroyed the rights and culture of the Amungme and other Indigenous tribal people.

¶ 43. Since defendant corporations have commenced their operations, many Amungme people have been displaced and relocated to areas in the lowlands away from their cultural heritage of highland living.

¶ 44. Other Indigenous tribal people, including but not limited to Komora Tribe, have met the same fate.

¶ 45. The egregious human rights and environmental violations, which have terrorized the tribal communities of the Amungme and other Indigenous tribal people, destroyed their natural habitats and caused dislocation of the populations have resulted in the purposeful, deliberate, contrived and planned demise of a culture of indigenous people whose rights were never considered, whose heritage and culture were disregarded and the result of which is ultimately to lead to the cultural demise of unique pristine heritage which is social-

70 F.3d at 244.

ly, culturally and anthropologically irreplaceable.

Amended Complaint ¶¶ 41–45. Since Plaintiff realleges the human rights and environmental practices in connection with the cultural genocide claim, the court may consider whether any of those allegations would be redressable if committed as acts of genocide.

Genocide is an international tort. The crime of genocide was clearly recognized in the aftermath of the Second World War by the United Nations, international conventions, United States law and case law. *Kadic*, 70 F.3d at 241 (citations omitted). Article II of the Convention on the Prevention and Punishment of the Crime of Genocide, 78 U.N.T.S. 277, ("Convention on Genocide"), defines the crime of genocide as:

[A]ny of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:

(a) Killing members of the group;

(b) Causing serious bodily or mental harm to the group;

(c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;

(d) Imposing measures intended to prevent births with the group;

(e) Forcibly transferring children of the group to another group.

This definition is generally accepted for purposes of customary law. Restatement § 702, comment d. The Convention on Genocide unambiguously applies to all: "[p]ersons committing genocide ... shall be punished, whether they are constitutionally responsible rulers, public officials, or private individuals." Convention on Genocide, art. IV. This language squares with the Genocide Convention Implementation Act of 1987, 18 U.S.C. § 1091 (1988),[6] and the Restatement, Re-

---

**6.** The Genocide Convention Implementation Act of 1987, 18 U.S.C. § 1091 (1988) criminalizes acts of genocide perpetrated by all persons, if committed in the United States or by a U.S. national. The Act provides, "Whoever commits genocide shall be punished" without regard to whether the offender is acting under color of law. This court agrees with the court in *Kadic* which found that the Act did not repeal by implication the Alien Tort Statute with respect to genocide, because there was no legislative intent to do so and the statutes are not repugnant to each other. *Kadic*, 70 F.3d at 242.

statement § 702, note d.: both non-state actors and state actors may be held liable for genocide.

The application of the definition of genocide to Beanal's complaint causes the court to pause. As mentioned above, Beanal does not allege genocide, but rather "cultural genocide." The court focuses on the allegation that Freeport's conduct has resulted in displacement, relocation and "purposeful, deliberate, contrived and planned demise of a culture of indigenous people." As defined, genocide means the destruction of a "group" not a "culture." Convention on Genocide art. II. The court accepts at face value that as a tribe, the Amungme would constitute a "group." Furthermore, as defined, genocide includes deliberate acts on the group conditions of life "calculated to bring about its physical destruction," but does not purport to include acts which cause "displacement" and "relocation" absent any physical destruction. *Id.* Finally, the acts of killing and causing serious bodily or mental harm constitute genocide only if they are carried out with the specific intent to destroy the group. The court is unwilling to make leaps of logic necessary to support a claim for genocide based on unpled facts. Clearly, Beanal has alleged certain acts, such as torture, which, if committed with the requisite intent, could constitute an act of genocide.[7] The problem is that Beanal has failed to make the core allegation that Freeport is committing genocide on a group of people. If Beanal in fact means that Freeport is destroying the Amungme culture, then he has failed to state a claim for genocide. On the other hand, if Beanal intended to state that Freeport is committing acts with the intent to destroy the Amungme group, i.e. its members, then he has failed to make this allegation sufficiently explicit. The court finds that a claim for genocide is not sufficiently clear and Beanal shall be given the opportunity to make a more definite statement, pursuant to Rule 12(e).

### 3. § 1350 Claims Requiring State Action

Beanal must allege state action in order to state a claim under § 1350 for non-genocide related human rights violations abuses.[8] Restatement § 702, *Kadic,* 70 F.3d at 244. International law prohibits states from engaging in certain human rights abuses, including genocide, murder, causing disappearance, torture, cruel and inhuman treatment or punishment, prolonged arbitrary detention and systematic race discrimination. Restatement § 702. The Restatement provides that "a state violates international law, if as a matter of state policy, it practices, encourages or condones" certain proscribed conduct. *Id.* With the exception of genocide, Plaintiff must allege state action in order to state a claim for any of these violations. *Id.*

---

**7.** Genocide is a specific intent offense. *Cf. Kadic,* 70 F.3d at 244. To prove genocide Beanal must demonstrate that certain acts were "committed with the intent to destroy, in whole or in part" an ethnic group. Intent may be averred generally. Fed. R. Civ. Proc. 9(b).

**8.** Official torture violates international customary law whether committed against a state's own citizens or the citizens of another state. H.R. Rep. No 367(I), 102nd Cong., 1st Sess.1991, 1992 U.S.C.C.A.N. 84, 1991 WL 255964, *3. With the enactment of the Torture Victim Protection Act, Congress expressly approved the holding in *Filartiga,* 630 F.2d at 884–885, that official torture is prohibited by the law of nations. In *Filartiga,* the court permitted Paraguayan citizens to sue a Paraguayan state official for official torture under § 1350. Id. at 878. Congressional approval of *Filartiga* should quell any doubt that the Fifth Circuit would now also recognize a claim under § 1350 for official torture against the claimant's own state. *See Carmichael,* 835 F.2d 109, 113. In *Carmichael,* the Fifth Circuit assumed without deciding, "that the Alien Tort Statute does confer subject matter jurisdiction over private parties who conspire in, or aid and abet, official acts of torture by one nation against the citizens of another nation." *Id.* at 113–114. The court also stated:

Official torture has been recognized as an actionable tort under the Alien Tort Statute in some jurisdictions and not in others. *Compare* Filartiga v. Pena–Irala, 630 F.2d 876 (2d. Cir. 1980), and Tel–Oren v. *Libyan Arab Republic,* 726 F.2d 774 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). Assuming the Supreme Court and the Congress continue to be silent on the issue, this circuit may be called upon at some point to join sides in this debate. This case, however, does not require that we stand up and be counted.

*Id.* at 113. Now that Congress has spoken, the Fifth Circuit may reevaluate its position in *Carmichael.*

To allege state action, the challenged conduct must be attributable to the state, in other words, it must be official conduct. Restatement § 207, comment c. A state is responsible for any violation of its obligations under international law resulting from action or inaction by "any organ, official, employee, or other agent of a government or of any political subdivision, acting within the scope of authority or under color of such authority." *Id.*

Freeport does not satisfy the definition of a "state" as that term is defined in international law. Restatement § 201.

Under international law, a state is an entity that has a defined territory and a permanent population, under the control of its own government and that engages in, or has the capacity to engage in, formal relations with other such entities.

*Id.* The fact that Freeport is itself not a "state" does not preclude its liability for violation of the law of nations since state actors, not merely the state itself, can be held liable for such violations. Restatement § 207.

The court must determine whether Plaintiff has sufficiently alleged that Freeport's alleged conduct constitutes state action. Preliminarily, the court notes that nowhere in his complaint does Plaintiff allege that Freeport is a state actor, that Freeport was clothed with actual or apparent authority of the Republic of Indonesia, that Freeport aided or abetted official conduct or that Freeport acted under color of Indonesian law. As discussed below, any such terminology is used in the complaint to link the alleged conduct to Freeport, rather than to link Freeport to the Indonesian government. In an effort to liberally construe the complaint, the court probes the allegations to determine if such facts could form a basis for state action.

To determine whether state action has been alleged, the court considers the test contained in Restatement section 207 and the "under color of law" jurisprudence of 42 U.S.C. § 1983 (" § 1983"). *Kadic,* 70 F.3d at 245; *Forti,* 672 F.Supp. at 1545; Restatement § 207, note 4. It is difficult to discern from his complaint the theory of state action that Beanal seeks to establish. In his memorandum, Beanal argues that the allegations contained in Paragraph 8 of the Amended Complaint satisfy the state action requirement. Plaintiff argues that "the 'symbiotic relationship' between FREEPORT's employees, within its security force, and the Indonesian military" satisfies the requirement that those individuals acted under the "actual or apparent authority" of the Republic of Indonesia. Opposition Memorandum, Record Doc. No. 81. Though this argument lends some insight into a Plaintiff's theory of state action, Plaintiff cannot augment his complaint through his opposition memorandum. The facts forming a basis for state action must be discernible from the face of the complaint. The following allegations implicate some governmental involvement:

¶ 8. The corporate defendants maintain a military presence within its mining operation wherein troops of the Republic of Indonesia are fed, transported, paid and provided equipment from the defendants in order to assist its operations.

¶ 10. . . . [Freeport has] systematically engaged in a corporate policy both directly and indirectly through third parties which have resulted in human violations against the Amungme tribal people and other Indigenous tribal people.

¶ 11. . . . The Indonesian Government is a major shareholder of the P.T. Freeport Indonesia, an affiliate of the defendants, Freeport, and the defendants' principle source of corporate income.

¶ 12. . . . [D]efendants' security guards in conjunction with third parties acting by and through the corporate policy of the defendants have engaged in summary execution, arbitrary.arrest and detention, torture, disappearances, surveillance and the destruction of property. Said violations have occurred on FREEPORT buses, within FREEPORT workshops, at FREEPORT security command centers, FREEPORT security stations, FREEPORT private roadways and containers owned by said corporate defendants.

¶ 21. That various human rights reports contain repeated first hand accounts of the brutal human rights violations of the

FREEPORT security personnel and/or agents of FREEPORT whose conduct is acquiesced to, accepted, adopted and/or ratified by the defendant corporations as part of their corporate policy in operation and expanding their FREEPORT mining concession in Irian Jaya, Indonesia at the expense of the local indigenous people.

¶ 22. The Plaintiffs allege that FREE-PORT security personnel or third parties supported by defendant corporations were acting under actual or apparent authority of the defendant corporations.

The court analyzes these allegations using the "under color of authority" test contained in the comments to Restatement section 207.

In determining whether an act was within the authority of an official or an official body, or was done under color of such authority, (clause (c)), one must consider all the circumstances, including whether the affected parties reasonably considered the action to be official, whether the action was for public purpose or for private gain, and whether the persons acting wore official uniforms or used official equipment.

Restatement § 207, comment d. Applying the considerations noted in the Restatement reveals no easy conclusions regarding an allegation of state action. First, it is unclear whether the "affected parties reasonably considered the action to be official." Beanal does not allege what exactly happened to him, who exactly he thought was involved in the challenged conduct, or whether he considered such person(s) to be engaging in official conduct. Second, it is unclear what purpose such abusive "security" practices could serve. Ostensibly, Freeport is motivated by "private gain", i.e. corporate profit seeking, and the "security" practices and presence of Indonesian military personnel are designed to "assist [Freeport's] operations." Amended Complaint ¶ 8. The fact that the Indonesian Government funds Freeport does not convert Freeport's alleged practices into official action. Beanal has not alleged that Freeport is carrying out some "public purpose" through its harsh security practices on behalf of the Indonesian government. Beanal does allege that Freeport maintains, i.e. feeds, transports, pays and equips, Indonesian military personnel on the premises. One could draw the inference that the military personnel participated first hand in the challenged conduct, help to create a martial atmosphere or lend an air of authority to Freeport's security practices. These are mere inferences, not allegations. Beanal alleges that the Indonesian military personnel uses equipment supplied by Freeport, not the government and does not indicate whether the military personnel wear official uniforms. Based on the Restatement test for official conduct, some of Plaintiff's allegations point to official action involving Indonesian Government personnel, while other allegations indicate that Freeport engaged in private conduct which occurred in the presence of Indonesian military personnel. Since the foregoing analysis is inconclusive, the court further probes the allegations pertaining to state action.

The court considers the "under color of law" jurisprudence of § 1983. In *Kadic,* the Second Circuit declared that plaintiff could meet the state action requirement by alleging that defendant "acted in concert with a foreign state." *Kadic,* 70 F.3d at 244–245. In *Carmichael,* the Fifth Circuit stated, without deciding, that a private actor could be liable in tort for violation of international law by conspiring in, aiding or abetting official acts. *Carmichael,* 835 F.2d at 114. In determining whether defendant "acted in concert" with a foreign state the court is guided by the "under color of law" jurisprudence applied in § 1983 cases. *Id.* at 245, *citing Forti,* 672 F.Supp. at 1549, *cf.* Restatement § 207, note 4. Section 1983 provides a cause of action against any person who, acting under color of state law, abridges rights created by the Constitution and the law of the United States. *Federal Jurisdiction* § 8.1. Section 1983 grants a remedy for violations of the Fourteenth Amendment of the United States Constitution, which provides, "No State shall ... deprive any person of life, liberty, or property, without due process of law." In deciding whether the Fourteenth Amendment has been violated, courts distinguish between private and governmental conduct. *See Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 349, 95 S.Ct. 449, 452–53, 42 L.Ed.2d 477 (1974), *quoting Shelley v.*

*Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948) (describing the "essential dichotomy" between governmental action, which is subject to constitutional scrutiny, and private conduct, which is not). By condemning only certain official conduct, these laws exclude a vast range of conduct visited upon victims at the hands of private actors. This dichotomy between private and official conduct is mirrored in international law. *See* Restatement § 207, comment c (A state is responsible under international law only for official acts, but not for acts by private actors.)

A private actor can be found liable under § 1983 for engaging in conduct which constitutes state action. The proper defendants in a § 1983 claim are those who represent the state in some capacity. *Gallagher v. Neil Young Freedom Concert,* 49 F.3d 1442, 1446 (10th Cir.1995). *National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 191, 109 S.Ct. 454, 462, 102 L.Ed.2d 469 (1988) (quoting *Monroe v. Pape,* 365 U.S. 167, 172, 81 S.Ct. 473, 476, 5 L.Ed.2d 492 (1961)). Similarly, in customary international law, a state is liable for official conduct committed by state officials. Restatement § 207, comment c, and § 702. The court understands the term "state" as it is used in the Restatement to be consistent with that term under § 1983 jurisprudence, i.e., "those who represent the state." Accordingly, to make out his claim Beanal must allege that Freeport engaged in state action in violation of his rights under the international law of human rights.

 Corporations can represent the state. Both private individuals and private entities can be state actors and can be held liable under § 1983. *Sims v. Jefferson Downs Racing Ass'n,* 778 F.2d 1068, 1076 (5th Cir.1985). Section 1983 does not require that the defendant be an officer of the State. *Dennis v. Sparks,* 449 U.S. 24, 27, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980). "Private persons jointly engaged with state officials in the challenged action, are acting under color of law for purposes of § 1983 purposes." *Id.* at 28, 101 S.Ct. at 186, *citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970). Section 1983

applies to all persons, including corporations. The Restatement does not address who can be sued for human rights violations. Comment b to Restatement section 702 provides:

> In general, a state is responsible for acts of officials or official bodies, national or local, even if the acts were not authorized by or known to the responsible national authorities, indeed even if expressly forbidden by law, decree or instruction. The violations of human rights cited in this section, however, are violations of customary international law only if practiced, encouraged, or condoned by the government of a state as official policy.

Restatement § 702, comment b. Section 702 uses the term "state," and the comments refer to "officials or official bodies." This language does not preclude corporate liability. Indeed, the term "official bodies" could cover private entities, rather than individuals, which engage in official conduct. *Carmichael* contemplated such corporate liability for a private actor which conspired in, aided or abetted official torture. *Carmichael,* 835 F.2d at 113–114. Thus, the court finds that a corporation found to be a state actor can be held responsible for human rights abuses which violate international customary law. Having so concluded, the court now considers four tests used to determine whether a private actor has engaged in state action for purposes of § 1983.

The Supreme Court has recognized several circumstances in which a private actor can be held to have acted under color of law within the meaning of § 1983. In *Gallagher,* the Tenth Circuit Court of Appeal summarized the relevant tests:

> The Court has taken a flexible approach to the state action doctrine, applying a variety of tests to the facts of each case. [1] In some instances, the Court has considered whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.[9] [2] The Court has also inquired whether the state has so far insinuated itself into a position

9. *Jackson,* 419 U.S. at 349, 95 S.Ct. at 453.

of interdependence with the private party, that there is a symbiotic relationship between them.[10] [3] In addition the Court has held that if a private party is a willful participant in joint activity with the State or its agents then state action is present.[11] [4] Finally the Court has ruled that a private entity, that exercises powers traditionally exclusively reserved to the State is engaged in state action.[12]

49 F.3d at 1447 (quotations omitted). The court refers to these four tests as (1) the nexus test, (2) the symbiotic relationship test, (3) the joint action test, and (4) the public function test.

*Gallagher* concerned the interaction between public officers and private security personnel. In *Gallagher* a group of individuals sued the University of Utah, a concert promoter and a private security corporation under section 1983 for violation of their Fourth Amendment rights. The plaintiffs were subjected to pat-down searches by the private security guards before entering the concert facility. University security officers observed but did not participate in the pat-down searches. After applying the four state action tests mentioned above, the Tenth Circuit Court of Appeal held that (1) the observation of the pat-down searches by university officials failed to provide the required nexus for state action, (2) the incidental benefits derived by the university from the concert was insufficient to satisfy the symbiotic relationship test for state action, and (3) the joint action test for state action was not satisfied due to plaintiffs failure to present any evidence that the university officers influenced or assisted the conducting of the pat-down searches. The holdings in *Gallagher* are instructive in determining whether a factual predicate for state action exists in Beanal's complaint. Notably, *Gallagher* involved a motion for summary judgment rather than a motion to dismiss, which means that the *Gallagher* court engaged in a more demanding inquiry than is appropriate here.

### The Nexus Test

Under the nexus test, a plaintiff must demonstrate that there is a sufficiently close nexus between the government and the challenged conduct such that the conduct may fairly be treated as that of the State itself. *Id.* at 1448. Governmental regulation, subsidy, approval of or acquiescence in the private conduct does not make the State responsible for the conduct. *Id.* To satisfy the nexus test, the state must be significantly involved in or actually participate in the alleged conduct. *Id.* at 1449, *citing NBC v. Communications Workers of America, AFL–CIO,* 860 F.2d 1022 (11th Cir.1988), *Wagner v. Metropolitan Nashville Airport Auth.,* 772 F.2d 227 (6th Cir.1985), *D'Amario v. Providence Civic Center Authority,* 783 F.2d 1 (1st Cir.1986).

The *D'Amario* case bears some factual resemblance to this one. In *D'Amario,* both a private concert promoter company and a municipally owned company were found to be state actors who abridged plaintiff's First Amendment rights. Civic center employees enforced a so-called "no camera" rule at certain performances at the publicly operated Providence Civic Center. Although the "no camera" policy stemmed from the contractual agreement between two private parties, the enforcement of policy by the civic center employees constituted state action under the nexus test. *D'Amario,* 783 F.2d at 3.

By contrast, in *Gallagher,* the court found that the observation by public employees of the pat-down searches performed by private security guards did not satisfy the nexus test for state action. *Gallagher,* 49 F.3d at 1450. The nexus test would be met if appellant could demonstrate that the pat-down searches directly resulted from the University's policies, but the mere presence of police officers did not transform the conduct of private parties into state action. *Id.* (citations omitted). The nexus test requirements of significant involvement and actual participation can be summarized as follows: where

---

10. *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 861–62, 6 L.Ed.2d 45; *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 175, 92 S.Ct. 1965, 1972–73, 32 L.Ed.2d 627 (1972).

11. *Dennis v. Sparks,* 449 U.S. at 27, 101 S.Ct. at 186.

12. *Jackson,* 419 U.S. at 352, 95 S.Ct. at 454.

public officers enforce violative policies, there is state action; where public officers merely observe the enforcement of violative policies, there is no state action.

Beanal fails to allege facts sufficient to establish state action based on the nexus test. From the complaint it appears that Freeport's security personnel are distinct from the military personnel. Beanal specifically states that the mine is "policed" by Freeport's paramilitary type security personnel. Amended Complaint ¶ 8. He further alleges, "Additionally, upon information and belief, the corporate defendants maintain a military presence ... in order to assist its operations." *Id.* Beanal does not allege, however, what role those Indonesian troops played in the alleged violative conduct. Put simply, Beanal hasn't alleged whether the military personnel helped enforce Freeport's policies or merely observed Freeport's private security guards engage in the violative conduct. Inferentially, the complaint seeks to link the troops to the violations at hand. To draw that conclusion, however, would require the court to make up facts not alleged in the complaint.

### The Symbiotic Relationship Test

State action can be established under the symbiotic relationship test if the state "has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity." *Burton*, 365 U.S. at 725, 81 S.Ct. at 862, *cited in Gallagher*, 49 F.3d at 1450. To establish a symbiotic relationship, the state and the private entity need be "physically and financially integral."

In *Burton*, the Court held a private restaurant to be a state actor. *Burton*, 365 U.S. at 723–24, 81 S.Ct. at 861. The Court found that by virtue of leasing its parking garage from a state agency, the restaurant func-

tioned as a "physically and financially integral and, indeed, indispensable part" of the state's operation of its property. *Burton*, 365 U.S. at 723–24, 81 S.Ct. at 861. The parking structure was located on public property and maintained through public funds; its primary purpose was to lease parking space to commercial lessees. *Compare Moose Lodge*, 407 U.S. at 175–177, 92 S.Ct. at 1972–1973 (finding no state action as to the discriminatory practices of a private club located on private property to which the state had granted a liquor license.)

The symbiotic relationship test from Burton is narrowly interpreted. The Court has held that state regulation, state funding, state approval of challenged conduct do not necessarily establish a symbiotic relationship between the state and a private entity. *Gallagher*, 49 F.3d at 1450 (citations omitted). Two salient facts from Burton remain critical: that the state profited from the restaurant's discriminatory practices and that the restaurant was an indispensable part of a state project.[13] *Id.*

In *Gallagher*, the court found no symbiotic relationship existed based on the fact that the pat-down searches took place on University property and the fact that the University profited from the concert. The two entities were not "functionally intertwined," long-term dependence of one on the other was lacking, and the contractual benefits generated by the unconstitutional contract were not "indispensable" to the University's financial success. *Gallagher* at 1452–1453. Payment under government contracts, government grants and tax benefits are insufficient to establish a symbiotic relationship between the government and a private entity. *Id. citing Rendell–Baker*, 457 U.S. at 830, 102 S.Ct. at 2765–66.

Beanal's complaint alleges a close link between Freeport and Indonesian government.

---

**13.** *See Milo v. Cushing Mun. Hosp.*, 861 F.2d 1194 (10th Cir.1988) (Finding state action on behalf of two doctors who were suspended from a municipally owned hospital that was managed by a private corporation whose representatives sat on the board of the public hospital trust); *Jatoi v. Hurst–Euless–Bedford Hosp. Auth.*, 807 F.2d 1214, 1220–1221 (5th Cir.), opinion modified on denial of rehearing, 819 F.2d 545 (5th Cir.1987) cert. denied, 484 U.S. 1010, 108 S.Ct. 709, 98 L.Ed.2d 660 (1988). In *Jatoi*, the court found state action based on the facts that the Hospital Authority was created by statute, located on public land and maintained by public funds; the Authority derived direct financial benefit from its private lessee, formerly ran the hospital itself and continued to control the purse strings. Id. at 1221.

The complaint alleges that the Indonesian Government is a major shareholder in P.T. Freeport Indonesia, and a principal source of Freeport's corporate income. Amended complaint ¶ 11. The complaint also refers to Freeport's "mining concession" throughout the complaint. It appears that the Indonesian government granted Freeport long-term mining rights, although the terms of such agreement are not mentioned in the complaint. There are too few facts alleged upon which to base a symbiotic relationship analysis for purposes of determining whether state action is alleged. A government contract conferring a mining concession and government investment in the operation are insufficient facts, standing alone, to allege a symbiotic relationship between Freeport and the Indonesian government.

### The Joint Action Test

 State action is present where a private party is a "willful participant in joint action with the State or its agents." *Dennis,* 449 U.S. at 27, 101 S.Ct. at 186. As the *Gallagher* court made clear, the joint action test looks to whether the state officials and private parties acted in concert in effecting a particular deprivation of constitutional rights. *Gallagher,* 49 F.3d at 1453. The Fifth Circuit appears to require some actual participation or cooperation on behalf of the state and private actor in violating complainant's rights. *See Sims,* 778 F.2d at 1079 (Solicitation and grant of improper use of state power rendered private plaintiff a willful participant in a joint action with the State or its agents.) As with the nexus test, state acquiescence or approval of the challenged conduct does not appear sufficient to satisfy the joint action test. *Gallagher,* 49 F.3d at 1455–1456. Rather, the presence of government officers must have influenced or been an integral part of the challenged conduct. *Id.* In *Gallagher,* the court found that there was no state action based on the joint action test because there was no evidence that the University shared with the private defendants the common goal to violate plaintiff's constitutional rights by conducting pat-down searches, that the University police influenced the decision to conduct the searches, or that the University played any role in the promotion company's decision to hire the private security company.

Beanal's complaint is insufficient under the joint action test for the reasons discussed with respect to the nexus test. Namely, the complaint fails to state what role, if any, the Indonesian military personnel played in the challenged conduct. In order to state facts sufficient to satisfy the joint action test, there must be some allegation indicating that the troops jointly cooperated in the conduct, jointly participated in the conduct, influenced the conduct or played an integral part in the deprivation of human rights. The complaint merely alleges an Indonesian military presence and obliquely refers to the participation of "third parties" who aided Freeport in the challenged conduct. The court finds that these allegations fail to make out a claim for state action under the joint action test.

### The Public Function Test

 Finally, state action can exist where a private entity performs a function traditionally the exclusive prerogative of the State. *Jackson,* 419 U.S. at 352, 95 S.Ct. at 454. Few public functions have been found to satisfy this test. *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 157–58, 98 S.Ct. 1729, 1734, 56 L.Ed.2d 185 (1978). Among those activities which satisfy the public function test is the operation of a company owned town, i.e. where the "streets, alleys, sewers, stores, residences, and everything else that goes to make a town" are privately owned. *See Hudgens v. N.L.R.B.,* 424 U.S. 507, 516, 96 S.Ct. 1029, 1034, 47 L.Ed.2d 196, *Marsh v. Alabama,* 326 U.S. 501, 505–09, 66 S.Ct. 276, 278–80, 90 L.Ed. 265. The management of a city park is also deemed an exclusive public function. *Evans v. Newton,* 382 U.S. 296, 298–302, 86 S.Ct. 486, 487–490, 15 L.Ed.2d 373 (1966).[14]

Again here, Beanal failed to allege facts which would satisfy the state action require-

---

**14.** The Court has rejected the public function test with respect to several other activities. *Gallagher,* 49 F.3d at 1456. *See, e.g., Blum,* 457 U.S. at 1011–12, 102 S.Ct. at 2789–90 (nursing home care), *Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. at 2771–72 (education of children), *Flagg Bros.,* 436 U.S. at 161–64, 98 S.Ct. at 1735–38 (enforcement of statutory lien by a private warehouse).

ment under the public function test. Beanal alleges that Freeport operates the Grasberg Mine, which encompasses an area of 26,400 square kilometers which site was "policed" by Freeport's security personnel. Beanal further alleges the alleged human rights violations "occurred on FREEPORT buses, within FREEPORT workshops, at FREEPORT security command centers, FREEPORT security stations, FREEPORT private roadways and containers owned by said corporate defendants." Amended Complaint ¶ 12. It is unclear from the complaint whether Freeport actually operates or owns a town, controls the roads and walkways, residences, markets, etc., or has taken over the functions of regulating local life. The allegations create a picture, nonetheless, of Freeport's vast and draconian control over the Grasberg Mine area.

In sum, Beanal has failed to allege state action. Beanal has failed to allege what role, if any, that Indonesian military personnel played in committing the alleged conduct. More importantly, Beanal has failed to allege facts which would convert Freeport's alleged conduct into official action. State action is required to state a claim for violation of the international law of human rights. The court therefore dismisses without prejudice Beanal's claim for human rights violations under the Alien Tort Statute for failure to state a claim, and grants Plaintiff leave to amend his complaint in order to more specifically allege facts which form the basis for his state action argument, pursuant to Rule 12(e). Fed. R. Civ. Proc. 12(e).

### Impact of Torture Victim Protection Act on § 1350

 The court rejects Freeport's contention that the Torture Victim Protection Act provides the sole cause of action for torture and extrajudicial killing brought under § 1350. The legislative history of the TVPA and recent case law stand for the contrary proposition that the TVPA codifies and expands the remedies available under § 1350. The court has failed to uncover a legislative intent to repeal or limit the kinds of claims redressable under § 1350.

The court focuses on the statutory text, the legislative history and recent case law.

The text of the TVPA does not indicate that the statute provides the exclusive set of remedies for torture and extrajudicial killings. Congress unambiguously indicated that the Alien Tort Statute "has other important uses and should not be replaced." H.R. Rep. 367(I), 102nd Cong., 1st Sess.1991, 1992 U.S.S.C.A.N. 84, 1991 WL 255964. In addition to codifying an "unambiguous and modern basis for a cause of action that has been successfully maintained under the existing law," Congress stated:

> The TVPA ... would enhance the remedy already available under section 1350 in an important respect: While the Alien Tort Claims Act provides a remedy to aliens only, the TVPA would extend a civil remedy also to U.S. citizens who may have been tortured abroad. Official torture and summary executions merit special attention in a statute expressly addressed to those practices. At the same time, claims based on torture or summary executions do not exhaust the list of actions that may appropriately be covered [by] section 1350. That statute should remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law.

*Id.* From this passage, it appears that Congress did not intend for the TVPA to impinge on the scope of § 1350 or change the "law of nations." Congress clearly meant for "other norms" and future rules of international customary law to be redressable under § 1350. Congress did not indicate whether the court meant for the TVPA to become the exclusive remedy for torture and extrajudicial killings. Considering that the TVPA "enhances" rather than shrinks the scope of remedies under § 1350, there is no reason to conclude that by enacting the TVPA Congress took away causes of action for torture and extrajudicial killings under § 1350.

The *Kadic* court reached the same conclusion. In *Kadic,* the court reviewed the legislative history and concluded, "The scope of the Alien Tort Statute remains undiminished by enactment of the Torture Victim Protection Act." 70 F.3d at 241. The court went on to address plaintiff's claims for torture and summary execution § 1350, noting that tor-

ture and summary execution are redressable under customary international law. *Kadic*, 70 F.3d at 243.

The court declines to find that TVPA repealed by implication the Alien Tort Statute, either in whole or in part. The doctrine of repeal by implication is disfavored. *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976). The Court recognizes certain appropriate circumstances:

> There are, however, "two well-settled categories of repeals by implication—(1) where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject matter of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act. But, in either case, the intention of the legislature to repeal must be clear and manifest...." *Posadas v. National City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936).

*Id.* In applying this test, the court repeats the relevant points discussed above. First, there appears no clear and manifest intent to repeal any portion of § 1350. Second, there is no irreconcilable conflict because the TVPA does not appear to limit any cause of action under § 1350. Recent case law recognizes that a cause of action for extra-judicial killing and torture may lie under § 1350 based on both the TVPA and customary international law. Third, the TVPA was not intended to replace § 1350; the legislature did not change the text of § 1350 or seek to give it a particular meaning. In sum, the TVPA does not supersede or curtail the scope of § 1350 which permits a cause of action by an alien for a tort in violation of the law of nations.

### Torture Victim Protection Act

With respect to Beanal's claims brought under the Torture Victim Protection Act, Freeport asserts that Beanal (1) failed to plead the requisite elements of the TVPA, and (2) that the TVPA does not apply to corporations.

The Torture Victim Protection Act provides an explicit cause of action for torture and extrajudicial killing. 28 U.S.C. sec. 1350, note, § 2. The TVPA provides:

> (a) Liability—An individual who, under actual or apparent authority, or color of law, of any foreign nation—
>
> > (1) Subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
> >
> > (2) Subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.
>
> (b) Exhaustion of remedies—A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.

*Id.* The terms "torture" and "extrajudicial killing" are defined by the statute. To state a claim under the TVPA, plaintiff must allege (1) that the individual defendant acted under color of law, (2) that defendant subjected an individual to torture or extrajudicial killing, and (3) that plaintiff has exhausted "adequate and available remedies" where the violative conduct occurred. Freeport alleges that Beanal has failed to allege the first and third elements.

By its terms, the TVPA only holds "individuals" liable. *Id.* The court must determine whether the term "individual" includes a corporation for the purposes of the TVPA. The Fifth Circuit recently iterated the following approach to discern the meaning of a word as used in a statute:

> As with any question of statutory meaning, we begin with the language of the statute. In determining a statute's plain meaning, we assume that absent any contrary definition, "Congress intends the words in its enactments to carry their ordinary contemporary, common meaning."

*U.S. v. Gray*, 96 F.3d 769, 774 (5th Cir.1996) (citations omitted) The statute is the sole source of congressional intent where the stat-

ute is clear and does not demand an absurd result. *In re Abbott Laboratories,* 51 F.3d 524, 529 (5th Cir.1995). In the same vein, the Supreme Court stated with respect to interpretation of the Bankruptcy Code: "The plain meaning of legislation should be conclusive, except in rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters. In such cases, the intention of the drafters, rather than the strict language controls." *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 240–42, 109 S.Ct. at 1030–31, 103 L.Ed.2d 290 (1989), *cited in Jove Engineering, Inc. v. I.R.S.,* 92 F.3d 1539, 1550 (11th Cir.1996).

The text of the TVPA does not define the term "individual." Before resorting to the legislative history, the court notes that the plain meaning of the term "individual" does not typically include a corporation. Webster's New Collegiate Dictionary defines "individual" as "a particular being or thing as distinguished from a class, species, or collection . . . a single human being as contrasted with a social group or institution." *Webster's New Collegiate Dictionary* 581 (8th ed.1979), *cited in Jove,* 92 F.3d at 1551. Black's Law Dictionary defines "individual" to mean "a single person as distinguished from a group or class, and also, very commonly, a private or natural person as distinguished from a partnership, corporation, or association . . . it may, in proper cases, include a corporation." *Black's Law Dictionary* 773 (6th ed.1996), *cited in Jove,* 92 F.3d at 1551. Like the *Jove* court, this court finds that the plain meaning of the term "individual" does not ordinarily include a corporation. *Id.*

A finding that the TVPA does not apply to corporations is not at odds with congressional intent. To give the term "individual" its plain meaning under the TVPA means that the Act does not apply to corporate entities. There is no legislative history as to whether corporations could be held liable under the Act. The House Report accompanying the TVPA bill states, "Only 'individuals', not foreign states, can be sued under the bill." H.R.Rep. No. 367(I), 102nd Cong., 1st Sess. 1991, 1992 U.S.S.C.A.N. 84 1991 WL 255964, *4. The Senate Report states, The legislation uses the term "individual" to make crystal clear that foreign states or their entities cannot be sued under this bill under any circumstances: "only individuals may be sued." S.Rep. No. 249, 102nd Cong., 1st Sess.1991, 1991 WL 258662, *6. These comments confirm that use of the term "individual" was not inadvertent. Congress purposefully chose the term so as to circumscribe foreign state liability under the Act. Congress does not appear to have had the intent to exclude private corporations from liability under the TVPA. Nevertheless, the Act clearly applies only to "individuals" and this court understands that term to plainly mean natural persons, not corporations. By use of the term "individual" the drafters may have unintentionally excluded corporations from liability under the Act. Even so, this court's interpretation that the TVPA only applies to natural persons is not at odds with the drafters apparent intentions, and indeed, gives deference to Congress' particular word choice.

The court concludes that because Freeport as a corporation is not an "individual" for purposes of the TVPA, Freeport cannot be held liable under the TVPA. Plaintiff has no cause of action under the TVPA because he cannot satisfy the first element required to state a claim under the Act. The court need not reach the issue of whether Beanal satisfied the exhaustion of remedies requirement.

## C. ENVIRONMENTAL CLAIMS

██ Freeport contends that Plaintiff's environmental claims should be dismissed on at least five different grounds; the court reaches only the first. Plaintiff has failed to state a claim for environmental violations upon which relief can be granted under § 1350 because Freeport's alleged environmental practices do not appear to have violated the law of nations.

As set forth in the complaint, Plaintiff alleges that Freeport's mining operations and drainage practices have resulted in environmental destruction with human costs to the indigenous people. The mine itself has hollowed several mountains, re-routed rivers, stripped forest and increased toxic and nontoxic materials and metals in the river sys-

tem. Amended Complaint ¶ 29. Another culprit is discharged water containing tailings from Freeport's mining operations, for it is from this discharge that a stream of environmental and human problems flow, including:

1) pollution, disruption and alteration of natural waterways leading to deforestation, *Id.* ¶ 26;

2) health safety hazards and starvation, *Id.* ¶ 27;

3) degradation of surface and ground water from tailings and solid hazardous waste, *Id.* ¶ 28.

Beanal alleges that the tailings drainage is mismanaged. Beanal further alleges that acid mine drainage is equally devastating, due to resulting sulfide oxidation and leaching, and also inadequately managed. In summary, Plaintiff complains:

Plaintiffs specifically allege that defendant corporations have failed to engage in a zero waste policy, unacceptable enclosed waste management system, have failed to maximize environmental rehabilitation, have failed to engage in an appropriate acid leachate control policy, have failed to adequately monitor the destruction of the natural resources of Irian Jaya and have disregarded and breached its international duty to protect one of the last great natural rain forests and alpine areas in the world.

*Id.* ¶ 40.

The court next determines whether any of these allegations, if true, amount to a violation of the law of nations. Plaintiff has not alleged that Freeport violated a specific treaty provision. As discussed above, in order to state a claim for violation of the law of nations under § 1350, plaintiff must establish the existence of a cognizable international tort. "These international torts, violations of current customary international law, are characterized by universal consensus in the international community as to their binding status and their content. That is, they are universal, definable, and obligatory international norms." *Forti,* 672 F.Supp. at 1540. To determine whether such a norm exists, the court may consider the works of jurists, general usage and practice of nations and judicial decisions recognizing and enforcing

that law. In this instance, the court reviewed case law, the Restatement, and a recent treatise on international environmental law. Having done so, the court discerns no claim of action against Freeport based on an international tort.

As a preliminary matter, courts have recognized that § 1350 may be applicable to international environmental torts. *See Aguinda v. Texaco, Inc.,* 1994 WL 142006 (S.D.N.Y.1994); *Amlon Metals, Inc. v. FMC Corp.,* 775 F.Supp. 668, 670 (S.D.N.Y.1991). Neither of these cases, however, found a cause of action for environmental torts in violation of the law of nations. *Aguinda* referenced the possible application of § 1350 for environmental practices "which might violate international law." *Aguinda,* 1994 WL 142006, *7. That suit was subsequently dismissed on grounds of comity, forum non-conveniens, and failure to join a necessary party. *Aquinda v. Texaco, Inc.,* 945 F.Supp. 625, 627 (S.D.N.Y.1996). *Amlon* involved the shipment of allegedly hazardous copper residue to a purchaser in England for metallic reclamation purposes. Among its claims, the purchaser sought recovery in tort under the Alien Tort Statute. The court rejected plaintiff's reliance on the Stockholm principles to support a cause of action under the § 1350 because "those Principles do not set forth any specific proscriptions, but rather refer only in a general sense to the responsibility of nations to insure that activities within their jurisdiction do not cause damage to the environment beyond their borders." *Amlon,* 775 F.Supp. at 671. This point is well taken with respect to Beanal's complaint.

Beanal has failed to articulate a violation of the international law. Plaintiff states that the allegations support a cause of action based on three international environmental law principles: (1) the Polluter Pays Principle; (2) the Precautionary Principle; and (3) the Proximity Principle. None of the three rises to the level an international tort. *Principles of International Environmental Law I: Frameworks, Standards and Implementation* 183–18 (Phillipe Sands ed., 1995) (hereinafter "Sands"). Sands includes the three principles mentioned by Plaintiff in a list of general rules and principles "which have

384

broad, if not necessarily universal, support and are frequently endorsed in practice." *Id.* at 183. Also listed are (1) the good-neighborliness and international co-operation principle and (2) the following rule, regarded the cornerstone of international environmental law: "[T]he obligation reflected in Principle 21 of the Stockholm Declaration and Principle 2 of the Rio Declaration, namely that states have sovereignty over their natural resources and the responsibility not to cause environmental damage." *Id.* Sands concludes:

> Of these general principles and rules only Principle 21/Principle 2 and the good neighborliness/international co-operation principle are sufficiently substantive at this time to be capable of establishing the basis of an international cause of action; that is to say, to give rise to an international customary legal obligation the violation of which would give rise to a legal remedy. The status and effect of the others remains inconclusive, although they may bind as treaty obligations or, in limited circumstances, as customary obligations.

*Id.*

The three principles relied on by Plaintiff, standing alone, do not constitute international torts for which there is universal consensus in the international community as to their binding status and their content. *Xuncax,* 886 F.Supp. at 186. More to the point, those principles apply to "members of the international community" rather than non-state corporations. *Id.* at 629–630, 652. Plaintiff alleges that Freeport's environmental practices reflect corporate decisions, rather than state practices. A non-state corporation could be bound to such principles by treaty, but not as a matter of international customary law. *See Id.* Consistent with this conclusion, the Restatement mentions only state obligations and liability in the area of environmental law. Restatement §§ 601–602.

In sum, Beanal has failed to allege an international environmental tort. The court dismisses Beanal's environmental claims for failure to state a cause of action for violation of international environmental law. Fed. R. Civ. Proc. 12(b)(6). Beanal has failed to articulate a substantive claim. In addition, Beanal alleged no facts that would establish, if proven, that Freeport's environmental practices constitute state action. Even assuming for the purposes of this motion that Beanal's allegations are true, Freeport's alleged policies are corporate policies only and, however destructive, do not constitute torts in violation of the law of nations. Having so concluded, the court finds it unnecessary to rule on Freeport's remaining defenses to the environmental allegations lodged against it.

## CONCLUSION

For the reasons stated, Beanal's claims brought under § 1350 for cultural genocide, human rights violations and international environmental torts are dismissed without prejudice. Fed. R. Civ. Proc. 12(b)(6). Plaintiff is granted leave to amend his complaint in order to more specifically allege his claims for genocide and human rights violations. Fed. R. Civ. Proc. 12(e).

**IT IS ORDERED** that Defendants Freeport McMoRan, Inc. and Freeport–McMoRan Copper & Gold, Inc.'s **Motion to Dismiss** is **GRANTED** and that Plaintiff Tom Beanal's claims brought under § 1350 are **DISMISSED WITHOUT PREJUDICE,** with leave to amend his complaint.