WESLEY, Circuit Judge,
dissenting:
The majority has undertaken to define a “firmly established” norm of international law, heretofore unrecognized by any American court or treaty obligation, on the basis of materials inadequate for the task. In deviating from our settled case law, the majority identifies no norm of customary international law, it creates a new norm out of whole cloth. Because the majority’s analysis misconstrues — rather than vindicates — customary international law, I respectfully dissent.
*192 Proceeding with “extraordinary care and restraint,” Flores v. S. Peru Copper Corp., 414 F.3d 233, 248 (2d Cir.2003), this Court has upheld jurisdiction under the Alien Tort Statute, 28 U.S.C. § 1350 (“ATS”), in only a handful of cases alleging violations of the most firmly established international law norms, see Kadic v. Karadzic, 70 F.3d 232, 241-43 (2d Cir.1995) (genocide and war crimes); Amerada Hess Shipping Corp. v. Argentine Republic, 830 F.2d 421, 426 (2d Cir.1987), rev’d on other grounds, 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) (free passage of neutral ship in international waters); Filartiga v. PenaIrala, 630 F.2d 876, 878 (2d Cir.1980) (state-administered torture). In Sosa v. Alvarez-Machain, the Supreme Court identified three such “paradigmatic” norms, namely “violation of safe conducts, infringement of the rights of ambassadors, and piracy.” 542 U.S. 692, 724, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). Rather than declare that list exhaustive for purposes of the ATS, the Court held that “any claim based on the present-day law of nations [must] rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized.” Id. at 725, 124 S.Ct. 2739. Accordingly, we are charged with “vigilant doorkeeping” when reviewing ATS claims to ensure that they rest on “a narrow class of international norms” comparable to the paradigms identified by the Supreme Court. Id. at 729, 124 S.Ct. 2739.
The majority identifies three criteria that must be satisfied before a violation of international law can be actionable under the ATS: that the norm is (1) specific and definable, (2) universally adhered to out of a sense of legal obligation, and (3) a matter of mutual concern, namely a matter “involving States’ actions performed towards or with regard to the other.” Flores, 414 F.3d at 249 (internal quotation and alterations omitted). I agree with the methodology used by the majority to determine whether a norm falls within the jurisdictional grant of the ATS, but I do not agree with their conclusion that a norm against non-consensual medical experimentation on humans by private actors is (1) universal and obligatory or (2) a matter of mutual concern.
The majority relies on eight sources of customary international law to support its determination that a norm against non-consensual medical experimentation on humans by private actors is universal and obligatory. However, this evidence falls far short of the quantum necessary to establish the existence of such a norm: (1) the International Covenant on Civil and Political Rights has been described by the Supreme Court as a “well-known international agreement! ] that despite [its] moral authority, ha[s] little utility,” in defining international obligations, Sosa, 542 U.S. at 734, 124 S.Ct. 2739, and moreover, it does not apply to private actors, such as the Defendant in this action; (2) the Council of Europe’s Convention on Human Rights and Biomedicine — a regional convention— was not ratified by the most influential nations in the region, such as France, Germany, Italy, the Netherlands, Russia and the United Kingdom, and it was promulgated on April 4, 1997, one year after the conduct at issue in this litigation; (3) the UNESCO Universal Declaration of Bioethics and Human Rights of 2005 and (4) the European Parliament Clinical Trial Directive of 2001 both also post-date the relevant time period by several years; (5) the Declaration of Helsinki issued by the World Medical Association, a private entity, and (6) the International Ethical Guidelines for Research Involving Human Subjects promulgated by the Council for International Organizations for Medical *193 Sciences, another private entity, “express[] the sensibihties and the asserted aspirations and demands of some countries or organizations” but are not “statements of universally-recognized legal obligations,” Flores, 414 F.3d at 262; (7) states’ domestic laws, which, unsupported by express international accords, are not “significant or relevant for purposes of customary international law,” id. at 249; and (8) the so-called Nuremberg Code, a statement of principles that accompanied a criminal verdict, possesses at best “subsidiary” value as a judicial decision, Statute of the International Court of Justice art. 38, June 26, 1945, 59 Stat. 1031, 33 U.N.T.S. 993 (“ICJ Statute”). Taken together, this evidence falls short of charting the existence of a universal and obligatory international norm actionable against non-government actors under the ATS.[1]
In support of its determination that non-consensual medical experimentation by private actors is a matter of mutual concern, the majority reasons that non-consensual medical experiments breed distrust of medical interventions and thereby accelerate the spread of infectious diseases across international borders. It is not enough, however, that tortious conduct could create some sort of international consequence. In order for conduct to be a matter of mutual concern, it must “threaten[ ] serious consequences in international affairs.” Sosa, 542 U.S. at 715, 124 S.Ct. 2739. Such is the case when an ambassador is assaulted, for example, because the assault “impinge[s] upon the sovereignty of the foreign nation and if not adequately redressed could rise to an issue of war.” Id. Non-consensual medical experimentation by private actors simply does not present the same grave risk of serious consequences in international affairs and is therefore not a matter of mutual concern.
For these reasons, I conclude that non-consensual medical experimentation by private actors, though deplorable, is not actionable under international law and would therefore affirm the district court’s dismissal of Plaintiffs’ complaints.
DISCUSSION
I. Universal and Legally Obligatory Adherence
In order for a principle to become a norm of customary international law, states must universally abide by it out of a sense of legal obligation, and not merely aspiration. See Flores, 414 F.3d at 248. It might seem obvious, but before one can determine whether a principle is universally followed, one must define the principle in question. Like domestic law, international law is not a monolith — a unitary set of rules applying indiscriminately to all actors that come within its reach. To the contrary, international law consists of rules that govern only states, rules that apply to private parties — individuals and corporations — and other rules that regulate both evenhandedly. See, e.g., Restatement (Third) of Foreign Relations of the United States § 101 (1987) (“Restatement (Third)”). As a result, the Supreme Court has required courts deciding whether a principle is a customary international law norm to consider “whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual.” Sosa, 542 U.S. at 732 n. 20, 124 S.Ct. 2739; see also id. at 760, 124 S.Ct. 2739 (Breyer, J., concurring) (“The norm must *194 extend liability to the type of perpetrator (e.g., a private actor) the plaintiff seeks to sue”).
The majority lists the norm at issue here as the prohibition of “medical experimentation on non-consenting human subjects,” Maj. Op. at 174-75, and proceeds to analyze that norm without regard to the alleged violator, see id. at 174-88. Put another way, the majority’s analysis would be no different if Plaintiffs had sued the Nigerian government, instead of, or in addition to, Pfizer. Such a broad, simplified definition ignores the clear admonitions of the Supreme Court — and conflicts with prior decisions of this Court — that a customary international law norm cannot be divorced from the identity of its violator. The majority’s analysis omits this critical consideration. As a result, the majority opinion presents only half of the equation. To my mind, the majority should have asked whether customary international law prohibits private actors from medical experimentation on non-consenting human subjects. That question must be answered in the negative.
A. The Majority’s Sources of Customary International Law
In Flores, we explained some of the difficulties inherent in determining what offenses violate customary international law:
Customary international law is discerned from myriad decisions made in numerous and varied international and domestic arenas. Furthermore, the relevant evidence of customary international law is widely dispersed and generally unfamiliar to lawyers and judges. These difficulties are compounded by the fact that customary international law ... does not stem from any single, definitive, readily-identiflable source.
414 F.3d at 247-48. We have consistently looked to the ICJ Statute as the starting point for determining the proper sources of international law. See, e.g., id. at 250-51; United States v. Yousef, 327 F.3d 56, 100-03 (2d Cir.2003). That statute lists: (1) “international conventions, whether general or particular, establishing rules expressly recognized by the contesting states”; (2) “international custom, as evidence of general practice accepted as law”; (3) “the general principles of law recognized by civilized nations”; and, in certain circumstances (4) “judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of rules of law.” ICJ Statute art. 38.
The ability to pick and choose from this seemingly limitless menu of sources presents a real threat of “creative interpretation.” Flores, 414 F.3d at 248; see also Amerada Hess, 830 F.2d at 429 (Kearse, J., dissenting). To mitigate this risk, and to prevent courts from becoming “roving commission[s],” Flores, 414 F.3d at 262, we have, in our cases, methodically assessed the weight and relative influence of not only each class of sources listed in the ICJ Statute, but many individual sources within each class. The near-infinite list of international law sources makes adherence to this precedent of paramount importance, for our analysis demonstrates that not every source of international law carries equal weight.
Instead of following and applying our framework, the majority substitutes in its place a compelling narrative. Over the course of only a few pages, the majority employs several sources that it believes demonstrate a customary norm against medical experimentation by non-state entities and weaves them together to reach its conclusion. See Maj. Op. at 175-85. Nowhere does the majority examine these *195 sources in the context required by Sosa. The majority does not discuss the weight of these sources, how they collectively demonstrate a customary norm, or how evidence supporting that norm compares with our ATS precedent. Had they done so, I am hopeful that my colleagues would reach the same conclusion that I do — that medical experimentation by private actors, while reprehensible, is not actionable under international law.
1. Treaties & Conventions
In Flores, we noted that treaties are the strongest evidence of customary international law because they “create legal obligations akin to contractual obligations on the States parties to them.” 414 F.3d at 256. “[W]e look primarily to the formal lawmaking and official actions of States ... as evidence of the established practices of States.” Yousef, 327 F.3d at 103. But not all treaties are equal. Although “[a]ll treaties that have been ratified by at least two States provide some evidence of the custom and practice of nations ... a treaty will only constitute sufficient proof of a norm of customary international law if an overwhelming majority of States have ratified the treaty.” Flores, 414 F.3d at 256. Moreover, the “evidentiary weight to be afforded to a given treaty varies greatly depending on (i) how many, and which, States have ratified the treaty, and (ii) the degree to which those States actually implement and abide by the principles set forth in the treaty.” Id. at 256-57. For instance, treaties ratified by the United States are of greater evidentiary value if they are either self-executing or executed through acts of Congress. See, e.g., id. at 257; Khulumani v. Barclay Nat’l Bank Ltd., 504 F.3d 254, 284 (2d Cir.2007) (Katzmann, J., concurring).
The majority relies primarily on two treaties.
a. International Covenant on Civil and Political Rights
The International Covenant on Civil and Political Rights, Dec. 9, 1966, S. Exec. Doc. E, 95-2, 999 U.N.T.S. 171, 6 I.L.M. 368 (ratified by the United States June 8, 1992) (“ICCPR”) “guarantees a broad spectrum of civil and political rights to individuals within signatory nations.” United States v. Duarte-Acero, 296 F.3d 1277, 1282 (11th Cir.2002). One of those rights- — to be free of non-consensual medical or scientific experimentation — is stated in Article 7.
The ICCPR is not appropriate evidence of customary international law for at least two reasons. First, the Supreme Court in Sosa explicitly described the ICCPR as a “well-known international agreement! ] that, despite [its] moral authority, ha[s] little utility under the standard set out in this opinion,” because the “United States ratified [it] on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts.” 542 U.S. at 734-35, 124 S.Ct. 2739 (emphasis added).
Second, whatever limited weight the ICCPR has with regard to state action, it does nothing to show that a norm prohibiting involuntary medical experimentation applies to non-state entities. In citing its seemingly universal language, the majority overlooks the ICCPR’s operative section, which requires that “[e]ach State Party ... undertake! ] to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant.” ICCPR art. 2(1). Thus, despite its broad text, the ICCPR by its own terms, only governs “the relationship between a State and the individuals within the State’s territory.” Duarte-Acero, 296 F.3d at 1283. Because the ICCPR only creates obligations flow *196 ing from a state to persons within its territory, a non-state actor cannot be said to have violated it. Thus, the ICCPR was relevant in Filartiga (decided before the Supreme Court limited its utility), in the context of state-administered torture of one of its citizens in contravention of one of the rights guaranteed by states in the ICCPR. See 630 F.2d at 884. But whatever its evidentiary value had Plaintiffs sued the Nigerian government, the ICCPR clearly has none where the question is whether international law includes a norm actionable against a private corporation.
b. Convention on Human Rights and Biomedicine
The second treaty cited by the majority is the Convention on Human Rights and Biomedicine, Apr. 4, 1997, E.T.S. No. 164 (the “Convention”), promulgated by the Council of Europe. See Maj. Op. at 183. Articles 5[2] and 16 [3] of the Convention require that the subject of scientific research give his or her informed consent, which may be withdrawn at any time.
The first problem with the majority’s reliance on the Convention is that it is a regional agreement not signed by the most influential states in the region. Membership in the Council of Europe is limited to European states. See Statute of the Council of Europe, art. 4, May 5, 1949, E.T.S. No. 1. It is difficult to see how the Convention demonstrates the universality of the medical experimentation principle when its signatories are limited to one continent. The majority also notes that the Convention has been signed by thirty-four states, see Maj. Op. at 183, but overlooks that it has only been ratified by twenty-two, and a treaty only evidences the customs and practices of states that have ratified it. Flores, 414 F.3d at 256. Lastly, and perhaps more importantly, the Convention is lacking even as evidence of a European norm, since it has not been ratified by the more influential European states, including France, Germany, Italy, the Netherlands, Russia and the United Kingdom, and a treaty’s evidentiary value increases along with the influence in international affairs of the states that have ratified it. See id. at 257; Convention on Human Rights and Biomedicine, Chart of Signatures and Ratifications as of December 23, 2008, http://conventions.coe.int/ Treaty/Commun/ChercheSig.asp?NT = 164 & CM=8 & DF= 12/23/2008 & CL=ENG (“Convention Ratifications Chart”).
A second, more fundamental problem with the majority’s reliance on the Conven *197 tion is that it was promulgated after the conduct at issue here. I know of no authority for an international ex post facto definition of the law of nations by later signed treaties. Cf. Vietnam, Ass’n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 118 (2d Cir.2008) (“The United States did not ratify the 1925 Geneva Protocol until 1975. Accordingly, the Protocol cannot be said to have constituted ‘a treaty of the United States,’ 28 U.S.C. § 1350, during the period relevant to this appeal.”). Plaintiffs allege that the Trovan testing occurred in March and April of 1996, but the Convention was not opened for signature until April 4, 1997, and did not bind any state until Slovakia’s ratification on January 15, 1998. See Flores, 414 F.3d at 256(“A State only becomes bound by — that is, becomes a party to — a treaty when it ratifies the treaty.”); Convention Ratifications Chart. The Convention is without import to this inquiry. Two other post-1996 sources cited by the majority, the 2005 UNESCO Universal Declaration on Bioethics and Human Rights and the 2001 European Parliament Clinical Trial Directive share equal evidentiary irrelevance for the same reason.
2. Multinational Declarations of Principle
Plaintiffs and the majority cite several multinational declarations, including the World Medical Association’s Declaration of Helsinki and the International Ethical Guidelines for Research Involving Human Subjects promulgated by the Council for International Organizations of Medical Sciences (“CIOMS Guidelines”), as additional evidence that the prohibition against non-consensual medical experimentation applies to non-state actors. In doing so, the majority somehow overlooks our decisions in Flores and Yousef.
In Flores, plaintiffs sought to demonstrate customary international law by reference to multinational declarations. In response, we noted that a declaration, “which may be made by a multinational body, or by one or more States, customarily is a ‘mere general statement of policy [that] is unlikely to give rise to ... obligation[s] in any strict sense.’ ” 414 F.3d at 262 (quoting 1 Oppenheim’s International Law 1189 (Sir Robert Jennings & Sir Arthur Watts, eds., 9th ed.1996)) (alterations in original). “Such declarations are almost invariably political statements — expressing the sensibilities and the asserted aspirations and demands of some countries or organizations — rather than statements of universally-recognized legal obligations.” Id. As a result, we concluded that “such declarations are not proper evidence of customary international law.” Id,, (emphasis added).
In Flores, the declarations we rejected were put forth by international governmental bodies, the Organization of American States and the United Nations Conference on Environment and Development. Id. at 263. Here, the two declarations embraced by the majority were put forward by entirely private organizations— hardly evidence of the state of international law. The Declaration of Helsinki was adopted by the World Medical Association, a group comprised not of member states, but of physicians and private national medical associations. “The World Medical Association (WMA) is an international organization representing physicians .... [and] has always been an independent confederation of free professional associations.” See The World Medical Association, “About the WMA,” http://www.wma.net/e/ about/index.htm. The express terms of the Declaration of Helsinki make it abundantly clear that it is hortatory, and not obligatory: “The World Medical Association (WMA) has developed the Declaration of *198 Helsinki as a statement of ethical principles .... ” See World Med. Ass’n, Declaration of Helsinki: Ethical Principles for Medical Research Involving Human Subjects art. A(l), June 1964. Similarly, CIOMS is “an international non-governmental, non-profit organization.” CIOMS, “What is CIOMS?”, http://www.cioms.ch/ jan2008_whatis_eioms.pdf.
Treating these well-meaning, aspirational, but private, declarations as sources of international law runs counter to our observation in Yousef that “no private person — or group of men and women such as comprise the body of international law scholars — creates the law.” 327 F.3d at 102. This is so for good reason. As we have seen in our ATS jurisprudence, international custom gives rise to legally enforceable obligations. To include the political statements of private organizations in the select and conscribed group of sources capable of creating international law would enfranchise non-democratic, unaccountable entities with governmental authority. As a result, these declarations are “not proper evidence of customary international law.” Flores, 414 F.3d at 262.
The majority focuses its lens on one line in Filartiga for the proposition that a “declaration may by custom become recognized as laying down rules binding upon the States.” Maj. Op. at 177 (quoting Filartiga, 630 F.2d at 883). In Filartiga, we were discussing a United Nations declaration, which though not binding, “creates an expectation of adherence” because it “speeif[ies] with great precision the obligations of member nations.” 630 F.2d at 883. The declarations relied on by the majority were not put forth by a governmental body such as the United Nations but by wholly private organizations, incapable of creating legally binding obligations.
3. State Practice
The majority also points to the great number of states that, in their respective domestic laws, require informed consent in medical research. That many countries have prohibited private actors from conducting medical experiments or treatments without informed consent is certainly commendable and worthy of praise, but not “significant or relevant for purposes of customary international law.”[4] See Flores, 414 F.3d at 249. For it is only when states prohibit domestic action as a result of “express international accords” that a wrong becomes a violation of customary international law. See Filartiga, 630 F.2d at 888 (quoting IIT v. Vencap, Ltd., 519 F.2d 1001, 1015 (2d Cir.1975) (Friendly, J.)). No such international accord exists here.
Moreover, “substantive uniformity” among states’ domestic laws is only a starting point for demonstrating international custom through individual state practice, which should also reflect a “procedural” consensus among states on how that behavior should be prosecuted — criminally and civilly. See Sosa, 542 U.S. at 761-62, 124 S.Ct. 2739 (Breyer, J, concurring). As Justice Breyer noted in his Sosa concurrence, the states of the world have reached both substantive and procedural agreement with respect to only a handful of certain international law norms made actionable against non-state entities. See id.; Part 1(B) infra. Non-consensual medical testing is not among them.
4. The Nuremberg Code
The majority centers its analysis around the Nuremberg Code, but, in the process, *199 critically misstates its genesis and status in international law. See Maj. Op. at 177-79. Because the Code is a sui generis source of international law, its context is vital to understanding what it is — and what it is not.
The Nuremberg trials are unquestionably one of this country’s greatest and most enduring contributions to the field of international law. As early as 1943, the Allied powers contemplated bringing Nazi war criminals to justice after the conclusion of the Second World War. At the October 1943 Moscow Conference, the United States, United Kingdom and Soviet Union issued a joint “Statement on Atrocities,” warning that:
At the time of granting of any armistice to any government which may be set up in Germany, those German officers and men and members of the Nazi party who have been responsible for or have taken a consenting part in the above atrocities, massacres and executions will be sent back to the countries in which their abominable deeds were done in order that they may be judged and punished according to the laws of these liberated countries and of free governments which will be erected therein.
Moscow Declaration Statement of Atrocities, Oct. 30, 1943, 9 U.S. Dept of State Bull. 310 (signed by President Roosevelt, Prime Minister Churchill and Premier Stalin). The statement added that German criminals “whose offenses have no particular geographical localization ... will be punished by joint decision of the government of the Allies.” Id.
Following victory in Europe and the surrender of Germany, the Allies executed the London Charter on August 8, 1945, establishing an International Military Tribunal to try the “major war criminals,” London Charter, Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, art. 3, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T. S. 279, and leaving the door open for other war criminals to be tried in any other “national or occupation court” that might be established, id. art. 6. Alongside the London Charter, the Allies promulgated the Charter of the International Military Tribunal and formed a four-member tribunal with one member appointed by each of the Allies, with jurisdiction over “the major war criminals” accused of committing three crimes: crimes against peace,[5] war crimes,[6] and crimes against humanity.[7] Charter of the International Military Tribunal, arts. 2, 6, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279. It was the International Military Tribunal that conducted the *200 celebrated trial that resulted in the convictions of 19 of 22 defendants, including high-ranking Nazi officials Hermann Goering, Rudolf Hess, and Karl Doenitz. See generally Robert H. Jackson, Final Report to the President on the Nuremberg Trials (Oct. 7, 1946). But the Nuremberg Code was adopted by a different tribunal in a different trial.
Four months after the London Charter established the International Military Tribunal, the Allied Control Council, the joint allied entity that governed post-war Germany, enacted Control Council Law No. 10, which authorized each of the occupying Allies, within its own “Zone of Occupation,” to arrest and prosecute “persons within such Zone suspected of having committed a crime,”[8] subject to a right of first refusal by the International Military Tribunal. Allied Control Council Law No. 10 art. Ill, §§ 1, 3 (Dec. 20, 1945), in 1 Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10, XVTII (William S. Hein & Co., Inc. 1997) (1949), available at http:// www.loc.gov/rr/frd/Military_law/pdf/NT_ war-criminals_Vol-I.pdf (“1 Trials of War Criminals ”).
The first of the American trials arising under Control Council Law No. 10 was the “Medical Case” against German doctors. On October 25, 1946, the American Office of Military Government for Germany enacted General Order 68, constituting Military Tribunal 1, comprised of three American military judges and one alternate judge. Id. at 5. That same day, Brigadier General Telford Taylor, Chief of Counsel for War Crimes, signed an indictment in United States v. Karl Brandt, et al. charging 23 defendants with war crimes, crimes against humanity, and conspiracy, and charging 10 of the defendants with membership in the “SS,” an organization declared criminal by the International Military Tribunal. Id. at 8-18. These charges were premised, primarily, on the defendants’ forced medical experiments, which constituted war crimes when performed on prisoners of war, and crimes against humanity when conducted on Nazi concentration camp prisoners.
At the conclusion of the Medical Case, 16 of the 23 defendants were convicted of one or more of the charges, and seven were ultimately sentenced to death. Along with their verdict, the military judges enumerated ten principles that came to be known as the Nuremberg Code, the first of which states that in medical experiments, the “voluntary consent of the human subject is absolutely essential.” 2 Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10, 181 (William S. Hein & Co., Inc.1997) (1949), available at 7 http://www.loc.gov/rr/frd/ Military_law/pdf/NT_war-criminals_Vol-II. pdf (“2 Trials of War Criminals ”).
My colleagues contend that the Code flowed naturally from the principles of law espoused in the London Charter. They are quite right, of course, that Control Council Law No. 10 was modeled after the London Charter and the American and International military tribunals shared largely the same general international law and procedural frameworks. The London Charter identified and defined certain international law offenses — Crimes Against Humanity, Crimes Against Peace, and War Crimes — while each of the twelve trials before the American military tribunal con *201 cerned a unique and horrific context for the commission of those crimes, ranging from medical experimentation on prisoners to the use of slave labor. For example, the definitions of Crimes Against Humanity and War Crimes under which the Nazi doctors were tried in the Medical Case were virtually identical to those of the London Charter. However, the majority overlooks the fact that the Nuremberg Code dealt not with these general principles of law, but instead with the very specific issue of permissible medical experimentation. The ethical principles espoused in the Code had no forebears in either the London Charter or the judgment of the International Military Tribunal. They were developed exclusively in the Medical Case.
I recite this history not to suggest that the Nuremberg Code is not an extraordinary or groundbreaking document, but rather to demonstrate the difficulty inherent in measuring its evidentiary weight, as it does not fit neatly into any of the categories this Court has identified for sources of international law. For one thing, the Code was developed by the United States military and announced by an American military court. See United States v. Stanley, 483 U.S. 669, 687, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987) (Brennan, J., dissenting). Certainly, the Code is not a treaty and did not immediately bind any state. Under the framework of the ICJ Statute— and, accordingly, this Court — because it was part of a criminal verdict, its closest analogue is a judicial decision, but judicial decisions are only “subsidiary,” rather than primary, sources of customary international law. See ICJ Statute art. 38; Maj. Op. at 173-74. I agree with my colleagues that the Code has had significant import — influence that continues to this day. The Code surely has evidentiary value in our inquiry, but there is nothing to indicate that the Code establishes a norm of international law prohibiting non-consensual medical experimentation or treatment by private actors, or compensates for the virtually non-existent evidentiary value of the other sources cited by the majority.
Conscious of our obligation to measure the weight of the sources of international law in the aggregate, what is the sum of the sources that serve as the cornerstone of the majority’s conclusion? The ICCPR, characterized by the Supreme Court as being of “little utility,” Sosa, 542 U.S. at 734, 124 S.Ct. 2739, which, in any event, does not apply to private actors; a pair of private organizations’ declarations that our Circuit precedent tells us “are not proper evidence of customary international law,” Flores, 414 F.3d at 262; one regional convention and two multi-national declarations that post-date the critical time period and are thus completely irrelevant; states’ domestic laws untethered to any international agreement that we are told is not “significant or relevant for purposes of customary international law,” id. at 249, 414 F.3d 233; and the Nuremberg Code, a document whose evidentiary value is unclear.
Simply put, the evidence here does not compare with the sources put forward in the few cases where we have held a principle to be a norm of customary international law. Exercising “extraordinary care and restraint,” see id. at 248, we have only upheld ATS jurisdiction in cases where the evidence of customary international law was entirely overwhelming.[9] In Filartiga, *202 we were persuaded by the fact that the “international consensus surrounding torture has found expression in numerous international treaties and accords.” 630 F.2d at 883 (emphasis added). There, the State Department — “the political branch with principal responsibility for conducting the international relations of the United States,” Flores, 414 F.3d at 262—had expressly announced that the prohibition against torture had ripened into a norm of customary international law.[10] Filartiga, 630 F.2d at 884. In Kadic, we observed that genocide was included in section 404 of the Restatement and that the Convention on the Prevention and Punishment of the Crime of Genocide had been ratified by more than 120 nations, including the United States, 70 F.3d at 240-42, while international criminalization of war crimes was established by four Geneva Conventions, ratified by more than 180 nations, including the United States, id. at 242-43. In Amerada Hess, it was similarly obvious that Argentina’s Falkland War attack on an American ship violated one of the oldest customary international law norms. 830 F.2d at 423-24. We cited a variety of international accords establishing the right of a neutral ship to free passage. Id. at 424. After tracing the norm to Blackstone, we concluded that it was “beyond controversy that attacking a neutral ship in international waters ... violates international law.” Id.
In those cases, the evidence of international acceptance of each norm with respect to each defendant was “clear and unambiguous.” Flores, 414 F.3d at 252. In each case, the nations of the world gathered to ratify in universal numbers treaties that specifically prohibited genocide, war crimes, torture, and attacks on neutral ships — not in generalized human rights agreements but in accords with those discrete norms as their exclusive subjects.
My colleagues contend that I look only to the presence (or, in this case, the absence) of a globally ratified treaty as the exclusive source of an international law norm. Far from it — we have held that customary international law “does not stem from any single, definitive, readily-identifiable source.” Id. at 248. However, the great weight of ATS jurisdiction must rest upon a foundation sturdy enough to support it. Just as it would be error to stubbornly require one source of sufficient strength to bear that burden on its own, the majority is equally mistaken in its attempt to employ a series of extraordinarily weak sources to secure a purported norm of customary international law. Our case law makes clear that even when viewed collectively, these sources are incapable of carrying the weight placed upon them by my colleagues.
B. Restatement § ¿OJ
Nor does Plaintiffs’ purported norm resemble the select few norms for which international law extends liability to private actors. Although the law of nations *203 in general does not “confine[ ] its reach to state action,” see Kadic, 70 F.3d at 239, courts must still consider whether the specific norm at issue does. In Kadic, we noted that the Restatement (Third) of Foreign Relations Law of the United States differentiates between “those violations that are actionable when committed by a state[11] and a more limited category of violations” that apply with equal force to private actors. Id. at 240 (citing Restatement (Third) §§ 404, 702). Section 404 of the Restatement authorizes universal criminal jurisdiction over non-state entities “for certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism, even where [no other basis of jurisdiction] is present.”[12] Universal jurisdiction, not to be confused with universal acceptance of a norm for ATS purposes, “permits a State to prosecute an offender of any nationality for an offense committed outside of that State and without contacts to that State.” Yousef, 327 F.3d at 103.
The plaintiffs in Kadic alleged that Radovan Karadzic, the “president” of the self-proclaimed republic of Srpska violated several international law norms, notably bans on genocide, war crimes and torture. 70 F.3d at 236-37. Treating Karadzic as a non-state actor, we reviewed not only the Restatement, but a host of relevant international accords, leading us to conclude that by their own terms, the norms prohibiting genocide and war crimes applied to private individuals, while torture and summary execution “are proscribed by international law only when committed by state officials or under color of law.” Id. at 241-43. We added that the “ ‘color of law’ jurisprudence of 42 U.S.C. § 1983 is a relevant guide to whether a defendant has engaged in official action for purposes of jurisdiction under the [ATS].” Id. at 245.
Five years later, we again determined whether an international law norm applied only to state actors. See Bigio v. Coca-Cola Co., 239 F.3d 440 (2d Cir.2000). Building on Kadic, we held that ATS jurisdiction over a non-governmental entity requires the violation of a norm “listed as an ‘act of universal concern’ in § 404 or ... sufficiently similar to [those] acts for us to treat them as though they were incorporated into § 404 by analogy,” or conduct committed under color of law. Id. at 448. In affirming the district court’s dismissal, we determined that the act at issue — discriminatory expropriation of property — is much more like the acts listed in section 702 than those in section 404, and that the complaint did not allege that Coca-Cola acted in concert with Egyptian state offi *204 cials. Id. at 447-49. However, unlike in Kadic, we saw no need to look beyond the Restatement to any sources of international law in order to conclude that the norm did not apply to non-state entities. Compare id. at 448, with Kadic, 70 F.3d at 241-43. It is equally clear that section 404 of the Restatement does not reveal a norm of customary international law prohibiting non-consensual medical experimentation by private actors.
To reiterate, section 404 lists only five specific acts for which universal criminal jurisdiction over private actors exists: piracy, genocide, slave trade, war crimes, and attacks on aircrafts. See also Vietnam Ass’n for Victims of Agent Orange, 517 F.3d at 116 (describing these five as comprising “the list of principles that may be said to have ripened into universally accepted norms of international law” (internal quotation marks omitted)). If anything, this Court has been even more stringent, holding that in spite of the Restatement, federal courts could not try an alleged airline bomber under customary international law principles of universal jurisdiction.[13] See Yousef, 327 F.3d at 103-08. Regardless, there is no dispute that none of the five acts in section 404 encompasses non-consensual medical experimentation. Instead, Plaintiffs argue that it is “sufficiently similar” to those acts to support its application to a private corporation.[14] See Bigio, 239 F.3d at 448. This Court has never had occasion to consider what types of acts are “sufficiently similar” to the section 404 acts except to conclude in Bigio that discriminatory expropriation was not among them. Id. For similar reasons, neither is non-consensual medical experimentation.
Universal jurisdiction originated with prosecutions of piracy more than 500 years ago. See Yousef, 327 F.3d at 104; United States v. Lei Shi, 525 F.3d 709, 723 (9th Cir.2008). As we explained in Yousef, piracy is universally punishable not because it is uniquely heinous but “because of the threat that piracy poses to orderly transport and commerce between nations and because the crime occurs statelessly on the high seas.” 327 F.3d at 104. By 1822, it was beyond “doubt ... that vessels and property in the possession of pirates may be lawfully seized on the high seas by [any] person, and brought in for adjudication.” United States v. the La Jeune Eugenie, 26 F. Cas. 832, 843 (C.C.D.Mass. 1822) (No. 15,551); see also United States v. Smith, 18 U.S. 153, 5 Wheat. 153, 163, 5 L.Ed. 57 (1820) (Story, J.) (discussing the bases for universal jurisdiction over piracy).
*205 Private actors trading slaves (as opposed to those engaging in slavery in general) are subject to universal criminal jurisdiction because the early treaties that formed the basis for customary international law considered the slave trade akin to piracy. For example, the 1841 Treaty of London provided that:
Their Majesties the Emperor of Austria, the King of Hungary and Bohemia, the King of Prussia, and the Emperor of all the Russians, engage to prohibit all trade in slaves, either by their respective subjects, or under their respective flags, or by means of capital belonging to their respective subjects; and to declare such traffic piracy. Their Majesties further declare that any vessel which may attempt to carry on the Slave Trade, shall, by that fact alone, lose all right to the protection of their flag.
Treaty for the Suppression of the African Slave Trade art. I, Dec. 20, 1841, 92 Con-sol. T.S. 437 (emphasis added), reprinted in M. Cherif Bassiouni & Edward M. Wise, Aut Dedere Aut Judicare: The Duty to Extradite or Prosecute in International Law 132-33 (1995); see also Kenneth C. Randall, Universal Jurisdiction Under International Law, 66 Tex. L.Rev. 785, 798 (1988) (“Currently, states can recognize universal jurisdiction over slave trading by ... customary law.”). Although we declined to hold in Yousef that the principle had ripened into a customary norm, attacks on airliners logically fit into this class because, like the high seas, airspace is stateless and extraterritorial.
After World War II, universal criminal jurisdiction was extended to private actors — including many of the Nazi defendants prosecuted under Control Council Law No. 10 — accused of crimes against humanity such as war crimes and genocide because, like piracy, “ ‘there is ... a lack of any adequate judicial system operating on the spot where the crime takes place— in the case of piracy it is because the acts are on the high seas and in the case of war crimes because of a chaotic condition or irresponsible leadership in time of war.’ ” Yousef, 327 F.3d at 105 (quoting Willard B. Cowles, Universality of Jurisdiction Over War Crimes, 33 Cal. L.Rev. 177, 194 (1945)); see also Flores, 414 F.3d at 244 n. 18 (“Customary international law rules proscribing crimes against humanity, including genocide, and war crimes, have been enforceable against individuals since World War II.”).
In Yousef, we concluded that these acts share two common traits: they “(1) are universally condemned by the community of nations, and (2) by their nature occur either outside of a State or where there is no State capable of punishing, or competent to punish, the crime.” 327 F.3d at 105.
Non-consensual medical experimentation is not “sufficiently similar” to these crimes to warrant its incorporation into section 404 by analogy. Plaintiffs acknowledge that the acts listed in section 404 share “a particular quality of crossing international boundaries,” a quality that they argue that medical experimentation shares “because of the universal uses of medical research and the common practice of physicians to travel to crisis areas to deliver humanitarian aid.” But the mere crossing of an international border does not give rise to universal jurisdiction over non-state actors. We made this clear in Yousef where we rejected universal jurisdiction over an individual accused of bombing of an aircraft leaving the Philippines for Japan. 327 F.3d at 98, 103. As we held, universal criminal jurisdiction over private actors is only appropriate for acts which, “by their nature,” are beyond state sovereignty. Id. at 105. Here, Pfizer’s alleged actions occurred exclusively within Nigeria, and *206 medical experimentation is not a crime which, by its nature, is incapable of state punishment. Plaintiffs’ argument to the contrary is belied by the state and federal civil and criminal actions pending against Pfizer in Nigeria. See Maj. Op. at 171-72.
As in Bigio, medical experimentation more closely resembles the acts for which only state actors may be held responsible. Plaintiffs compare medical experimentation with slavery. Yet, under the Restatement, while anyone may be prosecuted for engaging in the slave trade, slavery itself is only actionable against state actors. See Restatement (Third) § 702(b) (“A state violates international law if, as a matter of state policy, it practices, encourages, or condones ... slavery ... ”). Medical experimentation resembles slavery in its grievous exploitation of unconsenting and unwilling subjects; it also resembles torture in its infliction of horrific physical and emotional pain. However, both the Restatement and this Court have recognized that the norm against torture reaches only state actors. See Kadic, 70 F.3d at 243-44; Restatement (Third) § 702(d); see also Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art 1, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 (“CAT”) (defining torture as being “inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.”).[15]
One of the fundamental attributes of sovereignty is a state’s authority to exercise criminal jurisdiction over persons accused of committing crimes within its territory. The crimes listed in section 404 are not the extraordinary exceptions because they are singularly reprehensible or deserving of condemnation. Few would argue that piracy, for which private actors may be prosecuted universally but which requires neither an act of violence nor the infliction of physical injury,[16] is more heinous than torture or slavery, practices made actionable only against state entities. Rather, by definition, these crimes occur in locations where, or during times when, sovereignty, and a fortiori criminal jurisdiction, are incapable of being exercised. Because medical experimentation is entirely intra national and fully subject to domestic criminal jurisdiction, it is not “sufficiently similar” to those acts listed in section 404, and cannot be incorporated by analogy as to reach private, non-state actors.
The defendants in the Medical Case were not charged with conducting non-consensual medical tests per se. Rather, those tests, when conducted on prisoners of war and members of a discrete civilian population imprisoned in concentration camps, constituted “war crimes” and “crimes against humanity,” offenses for which customary international law has imposed individual responsibility. See Flores, 414 F.3d at 244 n. 18. Unlike the Defendant in this action, the Nazi doctors convicted by the American military tribunal were not private actors. Each convicted defendant held a position of authority in either the medical services or the military of the Third Reich.[17] See 1 Trials of War *207 Criminals 29. Moreover, the atrocities for which they were convicted victimized state prisoners in state-administered concentration camps, according to the Indictment, “for the benefit of the German Armed Forces.” Id. at 11-14. It is difficult to imagine a more egregious example of the violation of a customary international law norm or a more appropriate case for ATS jurisdiction.
The majority today authorizes the exercise of ATS jurisdiction over an entirely private corporation for violating a previously unrecognized norm of international law. In doing so, my colleagues accept proof far weaker than in any other case where this Court has identified a norm of customary international law, and, apparently, overlook the fact that this purported norm in no way resembles those few norms enforceable against private entities. When tasked by the Supreme Court with “vigilant doorkeeping” to ensure that the list of actionable international norms remains “narrow,” Sosa, 542 U.S. at 729, 124 S.Ct. 2739, we must be no less demanding than we have been in the past. Under that standard, the evidence put forward by Plaintiffs does not establish a norm of customary international law actionable against private actors. I believe that the majority’s decision departs from our settled case law and lowers considerably our previously high bar for ATS jurisdiction.
II. Mutuality
There are many principles on which most states of the world community agree. Most find support and enforcement in the richly diverse legal systems in place around the globe. But universal acceptance as a normative principle is not enough to gain entrance into the “law of nations.” The norm must not only be universal, it must touch on matters that are “of mutual, and not merely several, concern.” Filartiga, 630 F.2d at 888. Matters are of mutual concern when they “affectf] the relationship between states or between an individual and a foreign state, and [are] used by those states for their common good and/or dealings inter se.” IIT, 519 F.2d at 1015. On the other hand, matters of several concern are those “in which States are separately and independently interested.” Flores, 414 F.3d at 249. For example, as we noted in Flores, “murder of one private party by another, universally proscribed by the domestic law of all countries ... is not actionable under the [ATS] as a violation of customary international law because ‘the nations of the world’ have not demonstrated that this wrong is of mutual, and not merely several, concern.” Id. (quotation marks omitted). The majority concludes that non-consensual medical experimentation by one private party on another is a matter of mutual concern. I disagree.
We have consistently held that the best evidence that states consider a matter to be of mutual concern is the fact that they have agreed to be bound “by means of express international accords.” Filartiga, 630 F.2d at 888; see Flores, 414 F.3d at 249; Khulumani, 504 F.3d at 274 n. 7 (Katzmann, J., concurring). The majority points to the ICCPR, the Convention on Human Rights and Biomedicine, and the 2001 Clinical Trial Directive as evidence that “States throughout the world have entered into ... express and binding international agreements prohibiting nonconsensual medical experimentation.” See *208 Maj. Op. at 185. But those agreements fail to demonstrate mutuality for the same reason they fail to demonstrate universality — the ICCPR does not address acts by non-state actors and the other two were not in force at the time of the alleged misconduct. Whatever international consensus has been reached as to non-consensual medical experimentation by private actors has not yet “found expression in numerous treaties and accords,” of. Filartiga, 630 F.2d at 883. The majority cites no worldwide, multi-continental, universally applicable “Convention Against Medical Experimentation,” because, at the moment, none exists. That fact alone distinguishes this case from Filartiga, Amerada Hess, and Kadic.
In the absence of a binding global treaty, the majority seeks to demonstrate mutuality of concern by describing the downstream effects of non-consensual medical experimentation. In essence, the majority contends that non-consensual medical experiments feed distrust among their victims, which, in turn, engenders a general reluctance to seek future medical attention or vaccination, which, in turn, helps accelerate the spread of infectious diseases across international borders. See Maj. Op. at 186-87. Indeed, I would concede that the majority may be quite right. But a smaller, more interdependent world community has not been employed by the Supreme Court (or any other court to my knowledge) to convert claims such as those presented here into violations of the law of nations. In fact, the majority’s theory would be no different when evaluating the medical malpractice of Pfizer’s research physicians or the strict products liability for its allegedly defective drug, but malpractice and products liability are among the quintessential subjects of domestic law.
It is not enough that a wrong could create international ramifications; in order for it to be a matter of mutual concern, it must “threaten!] serious consequences in international affairs.” Sosa, 542 U.S. at 715, 124 S.Ct. 2739. The Supreme Court listed three historical mutual wrongs as guideposts to frame this inquiry: infringement of the rights of ambassadors, the violation of safe conducts and piracy. Id. at 715, 720, 124 S.Ct. 2739. An assault against an ambassador “impinged upon the sovereignty of the foreign nation and if not adequately redressed could rise to an issue of war.” Id. at 715, 124 S.Ct. 2739. The 18th century safe-conduct document was the historical equivalent of the modern passport, “which entitles a bearer with a valid visa to safe passage to, within, and out of a foreign land pursuant to a treaty or an agreement negotiated by his or her sovereign and the host sovereign.” Taveras v. Taveraz, All F.3d 767, 773 (6th Cir.2007) (quoting Thomas H. Lee, The Safe-Conduct Theory of the Alien Tort Statute, 106 Colum. L.Rev. 830, 874 (2006)). Thus, “the purpose of the doctrine of safe conducts under the law of nations is to protect the safety and security of the person and property of the journeying alien bearing the safe conduct privilege (and consequently to preserve commercial and diplomatic relationships between the alien’s host and home countries).” Id. at 773-74. This is still true today — a passport issued by the United States contains an official request from the Secretary of State to an authority of another sovereign state: “The Secretary of State of the United States of America hereby requests all whom it may concern to permit the citizen/national of the United States named herein to pass without delay or hindrance and in case of need to give all lawful aid and protection.” Breaches of customary international law impair the normal expectations that nations have in dealing with other nations. They must threaten serious consequences in international affairs because the norms were, and *209 still are, the foundation for states’ formal relationships with one another.
Piracy does not fit squarely with the other two Sosa historical paradigms, but the threat to international affairs posed by piracy needs no detailed exegesis. Suffice it to say that one of the young Republic’s first military tests was its campaign against the Barbary Pirates, see, e.g., Act For the Protection of the Commerce and Seamen of the United States Against the Tripolitan Cruisers, ch. IV, § 2, 2 Stat. 129, 130 (1802) (authorizing President Jefferson to instruct the armed forces to “seize and make prize of all vessels, goods and effects, belonging to the Bey of Tripoli ... and also to cause to be done all such other acts of precaution or hostility as the state of war will justify, and may, in his opinion, require.”), and piracy continues to threaten serious consequences in international affairs today, see S.C. Res. 1851, ¶ 2, U.N. Doc. S/RES/1851 (Dec. 16, 2008) (calling upon states “to take part actively in the fight against piracy and armed robbery at sea off the coast of Somalia”).
We have accepted no lesser showing in our case law. The threat posed by genocide is so great that states are empowered to request “the competent organs of the United Nations to take such action under the Charter of the United Nations as they consider appropriate for the prevention and suppression of acts of genocide.” Convention on the Prevention and Punishment of the Crime of Genocide art. 8, Dec. 9, 1948, 102 Stat. 3045, 78 U.N.T.S. 277. The Geneva Conventions collectively establish, and obligate contracting parties to follow, the laws of war — almost by definition a matter of international affairs. See Kadic, 70 F.3d at 242-43. On the other hand, because international law does not define torture to include acts by private entities, torturous conduct by non-state actors — while criminalized domestically — is not a matter of mutual concern. Id. at 243-44.
Demonstrating that a wrong is a matter of mutual concern must necessarily be difficult. The Supreme Court has only opened the door for ATS jurisdiction over a “narrow set of violations of the law of nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs.” Sosa, 542 U.S. at 715, 124 S.Ct. 2739. The nations of the world have not yet demonstrated that non-consensual medical experimentation by non-state actors “is of mutual, and not merely several, concern, by means of express international accords.” Filartiga, 630 F.2d at 888. Nor does it threaten serious consequences in international affairs in the same manner or to the same extent as the historical paradigms listed by the Supreme Court or their modern counterparts identified by this Court. Without either showing, I cannot agree with the majority that non-consensual medical experimentation by private actors is a matter of mutual concern.
III. State Action
The fact that medical experimentation by private actors is not a subject of customary international law does not end the inquiry. If international law supports state liability but not private liability, a private actor may still be liable if he or she “acted under color of law.” In that regard, we are told to employ our 42 U.S.C. § 1983 jurisprudence in the inquiry. See Bigio, 239 F.3d at 448; Kadic, 70 F.3d at 245. As an initial matter, this requires that the law of nations includes a norm actionable against states, which, in the instant case, is far from certain. But even assuming, for argument’s sake, that international law prohibits states from conducting non-consensual medical tests, Plaintiffs *210 have not demonstrated that Pfizer acted under the color of law.
This issue requires a bit of procedural context. In 2002, Pfizer moved to dismiss Plaintiffs’ complaint in Abdullahi on the grounds that (1) Plaintiffs had not alleged that Pfizer was a state actor, and (2) the alternate ground of forum non conveniens. See Abdullahi v. Pfizer, Inc., No. 01 Civ. 8118, 2002 WL 31082956, at *12 (S.D.N.Y. Sept. 17, 2002). Judge Pauley granted the forum non conveniens motion, but denied the state action motion, concluding that Plaintiffs “sufficiently allege[d] that the former Nigerian government and Pfizer were joint participants in the Trovan treatment.” Id. at *6. Plaintiffs appealed the district court’s dismissal, and Pfizer cross-appealed from the court’s denial of its motion to dismiss on state action. See Abdullahi v. Pfizer, Inc., 77 Fed.Appx. 48 (2d Cir.2003). On appeal, we vacated the district court’s judgment of dismissal, and did not reach Pfizer’s cross-appeal, noting that our intervening decision in Flores might have some application on remand. Id. at 53. Back before Judge Pauley, Pfizer filed a new motion to dismiss, arguing that Plaintiffs failed to state a claim under the substantially different ATS landscape which now included the Supreme Court’s decision in Sosa and our decision in Flores. See Abdullahi v. Pfizer, Inc., No. 01 Civ. 8118, 2005 WL 1870811, at *3 (S.D.N.Y. Aug. 9, 2005). Both of these decisions made clear that the identity of the defendant is a critical component of whether a principle is a norm of customary international law. Without addressing or affirming its previous conclusion finding sufficient allegations of state action, the district court granted Pfizer’s motion to dismiss, holding that medical experimentation was not actionable under the law of nations. Id. at *18. On appeal to this Court, both parties addressed the issue of state action in their briefs. The majority concludes that Plaintiffs’ allegations of state action were sufficient to defeat a motion to dismiss. See Maj. Op. at 187-88. I cannot agree.
In their twin complaints, which total 628 paragraphs, Plaintiffs make only four allegations concerning the role of the Nigerian government in the Trovan experiments: (1) in order for the FDA to authorize the export of Trovan, “Pfizer obtained the required letter of request from the Nigerian government”; (2) the government “arrang[ed] for Pfizer’s accommodation in Kano”; (3) the government acted “to silence Nigerian physicians critical of [Pfizer’s] test”; and (4) the government “assigned] Nigerian physicians to assist in the project.”[18] Elsewhere in their complaints, Plaintiffs note in eonclusory fashion that a Nigerian doctor did not publicly object to the Trovan study because it “seemed to have the backing of the Nigerian government.”
In their brief to this Court, Plaintiffs seek to bolster their complaints by describing the role of “Nigerian government doctors” at the allegedly government-owned hospital that hosted the study. However, the portions of the complaints that they cite do not support their contentions. Nowhere in their complaints did Plaintiffs allege that the hospital was, in fact, government owned or administered, nor did they allege that the four Nigerian doctors working with Pfizer were employed by the government, and our review of a decision to grant a motion to dismiss “is limited to the facts as asserted within the four corners of the complaint” and any *211 attached documents. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.2007).
These bare allegations are plainly insufficient to survive a motion to dismiss for lack of state action. The Supreme Court’s case law on state action is hardly a model of clarity, but certain principles are well-settled. As a threshold matter, the conduct alleged attributable to the state must be defined with the requisite specificity. “When analyzing allegations of state action, we begin ‘by identifying the specific conduct of which the plaintiff complains,’ ” Tancredi v. Metro. Life Ins. Co., 316 F.3d 308, 312 (2d Cir.2003) (quoting Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 51, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999)), and in most cases, a finding of state action “must be premised upon the fact that the State is responsible ” for that specific conduct, Horvath v. Westport Library Ass’n, 362 F.3d 147, 154 (2d Cir.2004) (internal quotation omitted). Determining state action in these cases “requires tracing the activity to its source to see if that source fairly can be said to be the state.” Leshko v. Servis, 423 F.3d 337, 340 (3d Cir.2005); see also Hadges v. Yonkers Racing Corp., 918 F.2d 1079, 1082-83 (2d Cir.1990). As we recently stated, when confronted with a motion to dismiss, it “is not enough ... for a plaintiff to plead state involvement in some activity of the institution alleged to have inflicted injury upon a plaintiff; rather, the plaintiff must allege that the state was involved with the activity that caused the injury giving rise to the action.” Sybalski v. Indep. Group Home Living Program, Inc., 546 F.3d 255, 257-58 (2d Cir. 2008) (internal quotations omitted).
Here, that activity was not, as the majority apparently concludes, conducting the Trovan trials in general, but rather administering the drug without informed consent. Although Plaintiffs allege that the Nigerian government requested the import of Trovan and arranged for Pfizer’s accommodations and some medical staff in Kano, they do not allege that the government or any government employee played any role in either administering Trovan without consent or deciding to do so in the first instance. The Supreme Court has described “the typical case raising a state-action issue” as one in which “a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action.” NCAA v. Tarkanian, 488 U.S. 179, 192, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). Plaintiffs have not alleged any facts that would indicate that the answer here is “yes.”
Plaintiffs’ complaints are more noteworthy for what they do not allege than what they do; They have not suggested that Pfizer was exercising any delegated state authority, cf. West v. Atkins, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), or that the Nigerian government “knowingly accepted] the benefits derived from [the unlawful] behavior,” Tarkanian, 488 U.S. at 192, 109 S.Ct. 454. Plaintiffs have not alleged that Pfizer conspired with government officials to deprive the subjects of their rights, cf. Fries v. Barnes, 618 F.2d 988, 991 (2d Cir.1980), nor have they alleged that the Nigerian government exercised any coercive power over Pfizer, cf. Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass’n, 531 U.S. 288, 296, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). In fact, Plaintiffs did not allege that any Nigerian government officials even knew about the non-consensual tests, because if Nigerian government doctors were somehow involved in the study, Plaintiffs did not specify what role, if any, they played.
The case of Beanal v. Freeport-McMoRan, Inc., 969 F.Supp. 362 (E.D.La.1997), *212 aff'd 197 F.3d 161 (5th Cir.1999), is instructive. In Beanal, plaintiffs seeking to recover under the ATS sought to establish state action on the basis of the Indonesian military’s involvement in allegedly actionable conduct. The court rejected that argument, holding that plaintiffs had not “alleged whether the military personnel helped enforce Freeport’s policies or merely observed ... the violative conduct.” Id. at 378. Broad conclusory statements of state involvement are not sufficient to establish state action; “there must be some allegation indicating that the troops jointly cooperated in the conduct, jointly participated in the conduct, influenced the conduct or played an integral part in the deprivation of human rights.” Id. at 379. The same is true here.[19] Plaintiffs’ allegations are inadequate.
Even without alleging that the State “coerced or even encouraged” the act complained of, Plaintiffs can still survive a motion to dismiss if “the relevant facts show pervasive entwinement to the point of largely overlapping identity between the State and the entity that the plaintiff contends is a state actor.” Horvath, 362 F.3d at 154 (quotation omitted). This line of cases revolves around the relationship between the state and the actor, as opposed to the specific act. Showing “overlapping identity” is highly uncommon, and most often arises where a private actor is performing one of the few functions traditionally and exclusively reserved to the state or is controlled by a state entity. State assistance by itself is insufficient — the relevant question is whether the decision-makers were ostensibly state actors. We answered that question in the affirmative in Horvath, where half of the putatively private defendant’s trustees were state appointees. Id. at 153. But the assistance alleged by Plaintiffs — helping to procure a ward in a hospital and arranging for the assistance of a handful of doctors — is not enough to clear this hurdle. Using government property, government staff, and even government funds does not make a private entity a state actor when its decisions are made independently of the state. See Yeo v. Town of Lexington, 131 F.3d 241, 254 (1st Cir.1997) (en banc).
Plaintiffs’ generalized allegations (unsupported by factual allegations) that the government acted to silence critics of the test are no more helpful. They do not allege who these government officials were, how they acted to silence critics, or when in the sequence of events this conduct occurred. Such a “merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity.” Ciambriello v. County of Nassau, 292 F.3d 307, 324 (2d Cir.2002).
At most, Plaintiffs’ complaints alleged that the Nigerian government acquiesced to or approved the Trovan program in general without knowing its disturbing details. That it approved the program is hardly surprising — in the midst of a widespread epidemic, the Nigerian government likely welcomed help from every entity offering it, but “[mjere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives.” *213 Blum v. Yaretsky, 457 U.S. 991, 1004-05, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). Plaintiffs have not demonstrated that Pfizer acted “under the color of law” such that it can be held liable for the Nigerian government’s alleged violation of the “law of nations.”
Plaintiffs’ allegations paint a vivid picture of the unspeakable pain and suffering of dozens of innocent children. The issue on this appeal, however, is not whether Pfizer’s alleged conduct was “wrong,” or even whether it is legally actionable, but whether it falls within both the “narrow class” of international norms for which ATS jurisdiction exists, and the even smaller subset of those norms actionable against non-state actors. Our Court and the Supreme Court have made it pellucidly clear that ATS jurisdiction must be reserved only for acts that the nations of the world collectively determine interfere with their formal relations with one another— including those rare acts by private individuals that are so serious as to threaten the very fabric of peaceful international affairs. I cannot agree with my colleagues that Pfizer’s alleged conduct poses the same threat or is so universally and internationally proscribed as to fit within that narrow class.
I respectfully dissent.

. Even if we were to conclude that such a norm applied to state actors and that private entities could be.held liable if they act under color of law, Plaintiffs have not pleaded sufficient state involvement to impose liability on Pfizer under that theory. See Part III infra.

. Article 5 — General rule
An intervention in the health field may only be carried out after the person concerned has given free and informed consent to it. This person shall beforehand be given appropriate information as to the purpose and nature of the intervention as well as on its consequences and risks. The person concerned may freely withdraw consent at any time.

. Article 16 — Protection of persons undergoing research
Research on a person may only be undertaken if all the following conditions are met:
i. there is no alternative of comparable effectiveness to research on humans; ii. the risks which may be incurred by that person are not disproportionate to the potential benefits of the research;
iii. the research project has been approved by the competent body after independent examination of its scientific merit, including assessment of the importance of the aim of the research, and multidisciplinary review of its ethical acceptability;
iv. the persons undergoing research have been informed of their rights and the safeguards prescribed by law for their protection;
v. the necessary consent as provided for under Article 5 has been given expressly, specifically and is documented. Such consent may be freely withdrawn at any time.

. Reliance on states' domestic laws also raises questions of mutuality, discussed infra at Part II.

. "Crimes Against Peace” were defined as “planning, preparation, initiation or waging of a war of aggression, or a war in violation of international treaties, agreements or assurances, or participation in a common plan or conspiracy for the accomplishment of any of the foregoing.” Charter of the International Military Tribunal art. 6(a).

. "War Crimes” were defined as “violations of the laws or customs of war. Such violations shall include, but not be limited to, murder, ill-treatment or deportation to slave labor or for any other purpose of civilian population of or in occupied territory, murder or ill-treatment of prisoners of war or persons on the seas, killing of hostages, plunder of public or private property, wanton destruction of cities, towns or villages, or devastation not justified by military necessity.” Charter of the International Military Tribunal art. 6(b).

. "Crimes Against Humanity” were defined as "murder, extermination, enslavement, deportation, and other inhumane acts committed against any civilian population, before or during the war; or persecutions on political, racial or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of the domestic law of the country where perpetrated.” Charter of the International Military Tribunal art. 6(c).

. In addition to the three crimes listed in the Charter of the International War Tribunal, Control Council Law No. 10 added a fourth— "Membership in categories of a criminal group or organization declared criminal by the International Military Tribunal.” Control Council Law No. 10 art. II, § (d).

. The majority purports to include our recent decision in Khulumani v. Barclay National Bank Ltd., 504 F.3d 254 (2d Cir.2007) (per curiam) in this select group, stating that it “held that the ATS conferred jurisdiction over multinational corporations that purportedly collaborated with the government of South Africa in maintaining apartheid because they *202 aided and abetted violations of customaiy international law.” Maj. Op. at 174. To the contrary, Khulumani did not confer jurisdiction and did not make any determination on whether plaintiffs had stated a violation of international law. It merely held that the district court erred in concluding that the ATS did not convey jurisdiction for "aiding and abetting violations of customary international law,” and remanded for consideration of whether plaintiffs had alleged such a violation that the defendants could have been liable for aiding and abetting. See Khulumani, 504 F.3d at 260.

. Indeed, the Supreme Court later declared that in ATS actions, "federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy.” Sosa, 542 U.S. at 733 n. 21, 124 S.Ct. 2739.

. Section 702 provides:
A state violates international law if, as a matter of state policy, it practices, encourages, or condones
(a) genocide,
(b) slavery or slave trade,
(c) the murder or causing the disappearance of individuals,
(d) torture or other cruel, inhuman, or degrading treatment or punishment,
(e) prolonged arbitrary detention,
(f) systematic racial discrimination, or
(g) a consistent pattern of gross violations of internationally recognized human rights.

. The Court explained its application of a criminal law provision to a civil statute by noting that a comment to section 404 "permits states to establish appropriate civil remedies such as the tort actions authorized by the [ATS].” Kadic, 70 F.3d at 240 (citation omitted). More specifically, "jurisdiction on the basis of universal interests has been exercised in the form of criminal law, but international law does not preclude the application of noncriminal law on this basis, for example, by providing a remedy in tort or restitution for victims of piracy.” Restatement (Third) § 404 cmt. b.

. Yousef was charged with placing a bomb aboard a Philippine Airlines jet flying from the Philippines to Japan. 327 F.3d at 81, 88. After holding that customary international law could not support universal jurisdiction, we observed that "treaties may diverge broadly from customary international law,” id. at 108, and upheld jurisdiction under 18 U.S.C. § 32, the statute implementing the "extradite or prosecute” provision of the Montreal Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation (Sabotage) art. 7, Sept. 23, 1971, 24 U.S.T. 565, 974 U.N.T.S. 177 ("The Contracting State in the territory of which the alleged offender is found shall, if it does not extradite him, be obliged, without exception whatsoever and whether or not the offence was committed in its territory, to submit the case to its competent authorities for the purpose of prosecution.”), id. at 108-10.

. I note the tension between our holding in Bigio that acts can, at least in theory, be incorporated into § 404 by analogy for ATS purposes, see 239 F.3d at 448, and our statement in Yousef that the "strictly limited set of crimes subject to universal jurisdiction cannot be expanded by drawing an analogy between some new crime ... and universal jurisdiction's traditional subjects” for purposes of exercising criminal jurisdiction, see 327 F.3d at 103-04.

. It should be noted that while universal criminal jurisdiction under the CAT does exist for torturers, those torturers must, by definition, be state actors. See CAT arts. 4, 7, 8.

. See, e.g., United Nations Convention on the Law of the Sea part VII, art. 101, Dec. 10, 1982, S. Treaty Doc. No. 103-39, 1833 U.N.T.S. 3 (stating that piracy may consist of "any illegal acts of violence or detention, or any act of depredation....”)

. All but three of the 23 defendants were doctors. 1 Trials of War Criminals 29. The three that were not were colonels or senior colonels in the Nazi SS. 1 Trials of War Crimi *207 nals 8, 29. Of the 20 doctors, all but one "held positions in the medical services of the Third Reich.” 1 Trials of War Criminals 29. The lone exception, Adolf Pokorny, a specialist in skin and venereal diseases, was acquitted of all charges. 1 Trials of War Criminals 10; 2 Trials of War Criminals 292-94.

. Plaintiffs also initially allege that the government backdated a letter of approval for the test, but then allege that the letter was in fact created by a "Nigerian physician whom Pfizer says was its principal investigator.”

. The case relied upon by the district court is entirely distinguishable. See Nat’l Coal. Gov't of the Union of Burma v. Unocal, Inc., 176 F.R.D. 329 (C.D.Cal.1997). There, plaintiffs survived a motion to dismiss by alleging that Unocal and the Burmese government were joint venturers and partners in a pipeline, with the Burmese government retaliating against protesters with military action and forced labor imposed by the Burmese military with Unocal’s knowledge. Id. at 348. There, as opposed to here, the state committed the unlawful acts.